UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————————————X

ELVIN SUAREZ,

                    Plaintiff,

        v.

ANTHONY J. ANNUCCI, Acting Commissioner, New
York State Department of Corrections and Community
Supervision, in his individual capacity; ANN MARIE T.
SULLIVAN, Commissioner, New York State Office of
Mental Health, in her individual capacity; ROBERT
MORTON, Superintendent, Downstate Correctional
Facility, in his individual capacity; RYAN LAHEY, Office
of Mental Health Unit Chief, Downstate Correctional
Facility, in his individual capacity; ABADUL QAYYUM,
Psychiatrist, Downstate Correctional Facility, in his
individual capacity; PETER M. HORAN, Supervising
Offender Rehabilitation Coordinator, Downstate
Correctional Facility, in his individual capacity;
SAMANTHA L. KULICK, Psychology Assistant
3/Supervisor, New York State Office of Mental Health, in
her individual capacity; MAURA L. DINARDO, Clinician,
New York State Office of Mental Health, in her individual
capacity; BRANDON N. REYNOLDS, Psychiatrist, New
York State Office of Mental Health, in his individual
capacity; CHESNEY J. BAKER, Licensed Master Social
Worker 2/Supervisor, New York State Office of Mental
Health, in his individual capacity; NEW YORK STATE
DEPARTMENT OF CORRECTIONS AND
COMMUNITY SUPERVISION; and NEW YORK STATE
OFFICE OF MENTAL HEALTH.

                    Defendants.

———————————————————————————————X

Case No.

**COMPLAINT AND
DEMAND FOR JURY
TRIAL**

      Plaintiff Elvin Suarez, by and through his attorneys, Morrison & Foerster LLP and The

Legal Aid Society Prisoners' Rights Project, hereby alleges as follows:

## **NATURE OF THE ACTION**

1.      Plaintiff Elvin Suarez is a 31-year-old Latinx man from Staten Island who is diagnosed with schizoaffective disorder, bipolar type.

2.      While Mr. Suarez was in State custody in 2017, Defendants—officials and employees of the New York State Department of Corrections and Community Supervision ("DOCCS") and the New York State Office of Mental Health ("OMH"), who knew of Mr. Suarez's serious mental illness and were responsible for treating Mr. Suarez while he was incarcerated—took actions that seriously exacerbated his condition, leading to tragic and wholly avoidable consequences.

3.      After Mr. Suarez disclosed his serious mental illness to Defendants, Defendant OMH categorized his condition as "serious" and routinely documented his symptoms. But Defendants OMH and DOCCS repeatedly failed to provide him with necessary mental health treatment.

4.      Predictably, with a lack of treatment, Mr. Suarez's symptoms worsened. In response to his decompensation, Defendants placed Mr. Suarez in segregated confinement. As Mr. Suarez approached his prison release date, his mother begged Defendants to give her son treatment so that he would be safe upon release.

5.      Defendants ignored these entreaties. They released Mr. Suarez directly from segregated confinement to the community untreated and unmedicated. Less than 24 hours later, experiencing untreated psychosis, Mr. Suarez repeatedly stabbed his mother. As a result of Mr. Suarez's involuntary violent act, he was reincarcerated and charged with attempted murder.

6.      Richmond County District Attorney Michael McMahon recognized that Mr. Suarez's violent act was an involuntary product of psychosis, consenting to the entry of a "not-guilty by reason of insanity" plea in Mr. Suarez's criminal case.

7.      Defendants' colossal failure to provide Mr. Suarez with adequate mental health treatment and divert him from segregated confinement was an injury to Mr. Suarez, his family, and the community. It demonstrated Defendants' callous disregard for the care and well-being of the people they purport to serve and disdain for people of color who are struggling with serious and persistent mental illness. Defendants actions also expose the fallacy of their commitment to keeping the people of the State of New York safe.

8.      Mr. Suarez brings this action under the Ku Klux Klan Act of 1871, amended and codified as 42 U.S.C. § 1983; the Americans with Disabilities Act ("ADA"), 28 U.S.C. § 12312; Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794; New York's Special Housing Unit Exclusion Law ("SHU Exclusion Law"), Correction Law § 137; and New York common law to seek damages for Defendants' actions.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343.

10.     This Court has supplemental jurisdiction over Mr. Suarez's claims under the laws of the State of New York pursuant to 28 U.S.C. § 1367.

11.     Venue is laid within the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred within this district.

12.     This case is designated as a White Plains case pursuant to Rule 18 of the Southern District of New York's Rules for the Division of Business Among District Judges.

## PARTIES

13.     Plaintiff Elvin Suarez was incarcerated at Downstate Correctional Facility from June 22, 2017 through September 5, 2017.

14.     Mr. Suarez has had a diagnosis of Schizoaffective Disorder, bipolar type for his entire adult life. He has struggled with suicidality and self-harm tendencies and has a long history of noncompliance with mental health treatment.

15.     Mr. Suarez has been incarcerated in New York City and New York State custody multiple times and has been confined to inpatient settings on several separate occasions.

16.     Mr. Suarez is still a young man with hopes and dreams for the future. Thus far, these dreams have been curtailed by mistreatment and discrimination at the hands of State officials, including Defendants.

17.     Defendant Anthony J. Annucci was the Acting Commissioner of Defendant DOCCS at all times relevant to this complaint. He was employed by Defendant DOCCS at all times relevant to this complaint.

18.     As Acting Commissioner, Defendant Annucci was responsible for the administration and operation of DOCCS, including the care and custody of incarcerated people with mental illness. N.Y. Correct. Law § 201.

19.     Defendant Ann Marie T. Sullivan was the Commissioner of Defendant OMH at all times relevant to this complaint. She was employed by Defendant OMH at all times relevant to this complaint.

20.     As Commissioner, Defendant Sullivan was responsible for the administration and operation of Defendant OMH, including the provision of services to incarcerated people with mental illness. N.Y. Correct. Law § 401.

21.     Defendant Robert Morton was the Superintendent of Downstate at all times relevant to this complaint. He was employed by Defendant DOCCS at all times relevant to this complaint.

22.     As Superintendent, Defendant Morton was responsible for the supervision and management of Downstate. Defendant Morton directed the work and defined the duties of all officers and subordinates of Downstate.

23.     Defendant Morton was also the ultimate authority regarding facility security and safety issues in the satellite mental health unit at Downstate.

24.     Defendant Morton supervised, and was directly involved in, all aspects of Mr. Suarez's care and custody during his 2017 incarceration.

25.     Defendant Ryan Lahey was the Mental Health Unit Chief at Downstate at all times relevant to this complaint. He was employed by Defendant OMH at all times relevant to this complaint.

26.     As Mental Health Unit Chief at Downstate, Defendant Lahey had ultimate authority over administrative, clinical, and mental health treatment areas at Downstate. Defendant Lahey was responsible for ensuring that Downstate mental health staff complied with OMH and Central New York Psychiatric Center ("CNYPC") policies and procedures and was the final authority on patient-specific treatment issues.

27.     Defendant Lahey supervised, and was directly involved in, all aspects of Mr. Suarez's mental health care during his 2017 incarceration.

28.     Defendants Annucci, Sullivan, Morton, and Lahey are herein collectively referred to as the "Supervisory Defendants."

29.     Upon information and belief, Defendant Abadul Qayyum was a psychiatrist, employed by Defendant OMH, working at Downstate at all times relevant to this complaint.

30.     In this capacity, Defendant Qayyum was responsible for providing mental health treatment to Mr. Suarez consistent with the United States Constitution, federal and state law, and OMH policies and procedures.

31.     Upon information and belief, Defendant Peter M. Horan was the Supervising Offender Rehabilitation Coordinator at Downstate all times relevant to this complaint. He was employed by DOCCS at all times relevant to this complaint.

32.     Upon information and belief, Defendant Samantha L. Kulick was a Psychology Assistant 3/Supervisor, employed by Defendant OMH, working at Downstate at all times relevant to this complaint.

33.     In this capacity, Defendant Kulick was responsible for providing mental health treatment to Mr. Suarez consistent with the United States Constitution, federal and state law, and OMH policies and procedures.

34.     Upon information and belief, Defendant Maura L. DiNardo was a mental health clinician, employed by Defendant OMH, working at Downstate at all times relevant to this complaint.

35.     In this capacity, Defendant DiNardo was responsible for providing mental health treatment to Mr. Suarez consistent with the United States Constitution, federal and state law, and OMH policies and procedures.

36.     Upon information and belief, Defendant Brandon N. Reynolds was a psychiatrist, employed by Defendant OMH, working at Downstate at all times relevant to this complaint.

37.     In this capacity, Defendant Reynolds was responsible for providing mental health treatment to Mr. Suarez consistent with the United States Constitution, federal and state law, and OMH policies and procedures.

38.     Upon information and belief, Defendant Chesney J. Baker was a Licensed Master Social Worker 2/Supervisor, employed by Defendant OMH, working at Downstate at all times relevant to this complaint.

39.     In this capacity, Defendant Baker was responsible for providing mental health treatment to Mr. Suarez consistent with the United States Constitution, federal and state law, and OMH policies and procedures.

40.     Defendants Qayyam, Horan, Kulick, DiNardo, Reynolds, and Baker are herein collectively referred to as the "Individual Defendants."

41.     Defendant DOCCS operates and oversees all New York State prisons, including Downstate. It is statutorily responsible for the confinement and rehabilitation of individuals placed in state correctional facilities and for their programming and supervision and the conditions of their confinement.

42.     Defendant DOCCS is a public entity covered by the ADA and Section 504.

43.     Defendant OMH is charged by statute with the "responsibility for seeing that mentally ill persons are provided with care and treatment, that such care, treatment and rehabilitation is of high quality and effectiveness, and that the personal and civil rights of persons receiving care, treatment and rehabilitation are adequately protected." N.Y. Mental Hyg. Law § 7.07(c).

44.     Defendant OMH enforces the laws and regulations applicable to mental health units within the DOCCS system.

45.     Defendant OMH is a public entity covered by the ADA and Section 504.

46.     Defendants DOCCS and OMH are herein collectively referred to as the "Agency Defendants."

## JURY DEMAND

47.     Mr. Suarez demands a jury trial in this action.

## FACTUAL ALLEGATIONS

### I.     Defendants Knew of Mr. Suarez's Serious Mental Illness but Failed to Provide Him with Needed Mental Health Treatment.

48.     In June 2016, Mr. Suarez was arrested for assault after allegedly vandalizing police cars and striking a police officer.

49.     During his pre-trial detention, State authorities deemed Mr. Suarez incapacitated as a result of a mental disease or defect and consequently transferred him to Kirby Forensic Psychiatric Center ("Kirby") for restoration to competency under New York Criminal Procedure Law § 730.

50.     State authorities later deemed Mr. Suarez restored to competency. He then accepted a plea deal.

51.     On or about June 22, 2017, Defendant DOCCS took Mr. Suarez into its physical custody and placed him at Downstate, a facility under the control of Defendant Morton.

52.     Mr. Suarez arrived at Downstate from Rikers Island with an active medication order for Zyprexa, an antipsychotic generally used to treat schizophrenia and bipolar disorder.

53.     Upon a person's admission to DOCCS' custody, Defendant DOCCS is required to conduct several intake evaluations, including a screening by the Health Services Department to

8

determine any immediate health-related issues. Defendant DOCCS is also required to send a "Custodial Transfer Information" sheet to Defendant OMH, specifying, based on an intake self-report, whether the new arrival has any known physical or mental health problems, including medication needs or self-injury/self-injury attempt. Defendant DOCCS is also required to make the new arrival available for Defendant OMH to conduct a suicide screening.

54.     During Mr. Suarez's intake evaluation, he reported to Defendant DOCCS his long history of mental health treatment and suicidality, bipolar diagnosis, and history of receiving inpatient treatment at Sharon Institute, Richmond County University Hospital, and other hospitals. He also reported that he had been prescribed Zyprexa. DOCCS documented these self-reports.

55.     Pursuant to Defendant DOCCS' policies, Mr. Suarez's reported history of suicide attempts should have prompted an *immediate* mental health referral and consultation with the watch commander. Defendants did not do this.

56.     Defendant DOCCS conducted Mr. Suarez's intake suicide screening later that same day. During this screening, Mr. Suarez reported to a nurse his bipolar and schizoaffective diagnoses. Mr. Suarez also reported his history of suicide attempts and prescription for the psychotropic medication Zyprexa. Defendant DOCCS documented these self-reports. In its screening document, Defendant DOCCS indicated that Mr. Suarez had visible scars and marks of self-mutilation. But again, Defendant DOCCS failed to take the necessary immediate action to address Mr. Suarez's mental health treatment needs.

57.     The following day, Defendant Kulick saw Mr. Suarez for his routine mental health admission screening and medication consult. During this screening, Defendant Kulick was required to gather information regarding Mr. Suarez's prior clinical treatment. Defendant Kulick

was required to gather this information from family contacts, the Mental Health Automated

Record System database ("MHARS"), the Psychiatric Services and Clinical Knowledge

Enhancement System database ("PSYCHES"), and other available sources.

58.     Due to Mr. Suarez's report that he had received prior mental health services,

Defendant Kulick was also required to seek CNYPC Corrections-Based Mental Health Services

records, records from other OMH facilities, records from non-OMH Inpatient Hospitalizations,

and records from Non-OMH outpatient providers.

59.     Defendant Kulick confirmed Mr. Suarez's diagnosis of schizoaffective disorder,

bipolar type, prescribed him Zyprexa, and admitted him to OMH services. In her

screening/admission note documenting this evaluation, Defendant Kulick wrote that Mr. Suarez

reported that he was prescribed medication for mood swings and auditory hallucinations that told

him to harm himself. Defendant Kulick also wrote that Mr. Suarez self-reported medication

compliance and said that his medication effectively treated his symptoms.

60.     This same document indicated that Defendant Kulick checked MHARS during

her screening. MHARS affords OMH access to the clinical histories and records of all

individuals who have been treated by OMH.

61.     MHARS provided Defendants with access to records of all of Mr. Suarez's prior

inpatient hospitalizations in state-operated hospitals and mental health treatment he received

during his incarcerations. These records documented his prior medication refusals and history of

inconsistent engagement in treatment. In her June 23 screening/admission report, Defendant

Kulick documented that MHARS indicated that Mr. Suarez had received inpatient treatment at

Kirby on two separate occasions in 2016 and 2017, and was diagnosed with Schizoaffective

Disorder, Bipolar type. Defendant Kulick also documented other relevant treatment history that she pulled from MHARS.

62.     Defendant Kulick did not seek the other information she was required to seek pursuant to Defendant OMH's policies, including information from family, records from CNYPC Corrections-Based Mental Health Services, records from other OMH facilities, records from non-OMH inpatient hospitalizations, and records from non-OMH outpatient providers.

63.     Recognizing the seriousness of Mr. Suarez's mental illness, Defendant Kulick provisionally classified Mr. Suarez as a Mental Health Service Level 1, the most severe classification of mental illness. OMH classifies incarcerated people with mental illnesses in a series of "Levels" based on the seriousness of their illness. Level 1 denotes the most serious mental illness and Level 4 denotes the least serious mental illness. People who are classified Level 6 are determined not to require mental health treatment and are considered "off the mental health case load." (There is no Level 5.)

64.      In addition, incarcerated people categorized as Level 1 or Level 2 may be given an "S-designation," which denotes that the person has a serious mental illness and is experiencing pronounced mental health symptoms requiring intensive mental health treatment and services.

65.     An S-designation is based on acuity, or severity, of mental health symptoms. Defendant OMH is required to consider issuing S-designations to people who have deteriorated while in segregated confinement and people who are experiencing a significant functional impairment. Defendant OMH is required to attempt to review all information relevant to its decision whether to issue an S-designation, including records of past treatment and hospitalizations.

66.      Defendant Kulick provisionally issued Mr. Suarez an S-designation, subject to review and approval by Defendant Lahey. By provisionally issuing Mr. Suarez an S-designation, Defendant Kulick documented her understanding that Mr. Suarez required the most intensive mental health services available in the DOCCS system, including daily cell-side clinical contact, weekly confidential contact with a psychiatrist, medication management, comprehensive discharge planning, and other services. The same day, Defendant OMH confirmed Mr. Suarez's prescription for 30 milligrams of Zyprexa per day.

67.      On or about June 24, 2017, Defendant DOCCS transferred Mr. Suarez to the Forensic Diagnostic Unit at Downstate, which is jointly operated by Defendants DOCCS and OMH. Defendant OMH nominally provides mental health treatment on the unit. Records show, however, that Mr. Suarez was not provided adequate mental health treatment while housed in the Forensic Diagnostic Unit.

68.      Between June 23, 2017 and June 30, 2017, Mr. Suarez had *no* contact with Defendant OMH's staff. On or about June 30, 2017, after Mr. Suarez suffered through a full week without clinical contact, Defendant Lahey processed Mr. Suarez's S-designation and officially designated Mr. Suarez a Level 1-S patient. In a progress note dated June 30, 2017, staff of Defendant OMH noted that Mr. Suarez had a history of hearing voices.

69.      That same day, Mr. Suarez began refusing to take his psychotropic medication. In documenting this refusal, Defendant Lahey noted that Mr. Suarez stated he was hearing voices and that Zyprexa was not helping. Defendant Lahey indicated that he informed Mr. Suarez he should comply with his prescription but took no additional action. Defendant Lahey instead indicated that Defendant OMH would follow-up with Mr. Suarez in *two weeks*.

70.     Defendant Lahey's failure to immediately respond to Mr. Suarez's medication noncompliance represented a crucial missed opportunity to obtain compliance, which could have influenced the rest of his tragic incarceration.

II.     **Defendants Persisted in their Failure to Treat Mr. Suarez's Serious Mental Illness Even After Classifying him a Mental Health Level 1-S and Learning of his Medication Noncompliance**.

71.     Defendants waited approximately 20 days before following up with Mr. Suarez and checking on his medication compliance.

72.     This was contrary to 14 NYCRR 527.8(5)(ii)(a), which governs the mental health unit in which Mr. Suarez was held, and mandates:

> [U]pon an inmate patient's objection to the proposed administration of psychotropic medication, the treating physician shall formally evaluate whether the administration of psychotropic medication is in the inmate patient's best interests, in light of all relevant circumstances including the risks, benefits and alternatives to the inmate patient of the administration of psychotropic medication, and the nature of the inmate patient's objection thereto, and whether the inmate patient has the capacity to make a reasoned decision concerning the administration of such medication.

73.     Upon information and belief, between Mr. Suarez's initial evaluation on June 30, 2017 and his follow-up evaluation on July 19, 2017, OMH did not conduct any evaluation of Mr. Suarez's need for medication nor conduct any counseling regarding medication compliance.

74.     On July 19, 2017, after Mr. Suarez had gone weeks without clinical contact, Defendant Kulick met with him to complete his Core History and Treatment Plan. A Core History serves as the basis for a Treatment Plan by "provid[ing] information regarding events, behaviors and relationships significant to the patient's reason for admission and treatment needs, provid[ing] the history which forms the basis for assessment and development of treatment plan goals and objectives, and provid[ing] a data base which is updated continually and follows the

patient across treatment settings." Central New York Psychiatric Center Corrections-Based
Operations UCR Policy # 9.14, Core History.

75.     A Treatment Plan lists the patient's symptoms and concerns, reviews and
establishes diagnoses, implements treatment goals and objectives, documents the status of
treatment, and initiates the discharge planning process.

76.     The Core History, Treatment Plan, and a Progress Note documenting them
contained several inaccurate and contradictory statements about Mr. Suarez's medication
compliance and symptomology. These inaccurate statements partially formed the basis for
Defendants' failure to treat Mr. Suarez's serious mental illness during the remainder of his
incarceration.

77.     For example, the Core History, which Defendant Kulick drafted, stated that Mr.
Suarez was prescribed medication for mood swings and self-harming tendencies. Mr. Suarez's
Core History also stated that Mr. Suarez reported medication compliance and stated that his
medication was effective at treating his symptoms. However, Mr. Suarez's treatment plan, which
Defendants Qayyum and Kulick drafted, stated that although Mr. Suarez found that his mood
disturbances were interfering with his functioning, he was not prescribed medication. Mr.
Suarez's progress note further documented his refusal of his psychotropic medication and stated
that his medication was discontinued.

78.     Despite the treatment plan and progress note documenting Mr. Suarez's lack of
compliance with treatment, Mr. Suarez's Core History stated that he was compliant with
treatment and medication and recommended that he remain so.

79.     The Progress Note, Core History, and Treatment Plan show that Mr. Suarez
required intensive mental health treatment. Yet, Defendant OMH failed to follow-up with Mr.

14

Suarez for the next two days. Records indicate that Mr. Suarez's serious psychiatric treatment needs and refusal of psychotropic medication went unaddressed by OMH during this two-day period.

80.     On or about July 21, 2017, Defendant OMH conducted a *pro forma* cell-side visit with Mr. Suarez during which OMH staff documented his continued medication refusal and committed to follow-up with Mr. Suarez, but not for another *three weeks*. Other than a checkmark in the relevant field, there is no indication that OMH afforded Mr. Suarez any medication education or conducted counseling as required by the foregoing policy.

81.     Between July 21, 2017 and August 3, 2017, staff of Defendant OMH again made no contact with Mr. Suarez. On August 3, 2017, Mr. Suarez met with Defendant OMH staff not in a clinical encounter, but to meet the OMH discharge planner, Defendant Baker. The next several weeks would reveal serious contradictions between Defendant OMH's indifferent approach to Mr. Suarez's in-custody mental health treatment and its appraisal of his discharge planning needs.

82.     Defendant Baker's initial draft discharge plan for Mr. Suarez, completed on or around August 4, 2017, recommended Mr. Suarez continue outpatient treatment and medication. It also recommended that Mr. Suarez enroll in Assisted Outpatient Treatment ("AOT"), which is a program authorizing court-ordered treatment in the community for people with severe mental illness at risk of relapse or deterioration absent voluntary compliance with prescribed treatment. To be eligible for AOT, a person must have a history of treatment noncompliance that has resulted in (1) psychiatric hospitalization or incarceration at least twice in the past 36 months, or (2) committing serious acts or threats of violence to self or others in the past 48 months. They must also be found, as a result of mental illness, to be unlikely to voluntarily participate in

15

treatment and to need AOT to prevent deterioration that would likely result in harm to themselves or others.

83.    Defendants OMH and Baker recommended Mr. Suarez's enrollment in AOT due to his history of violence following medication noncompliance, noting his medication noncompliance during his 2016 and 2017 hospitalizations at Kirby.

84.    During this period, Mr. Suarez's mother observed Mr. Suarez's condition deteriorating rapidly while he was off his medication. She reported Mr. Suarez's deterioration to DOCCS and OMH staff.

### III.    **After Denying Mr. Suarez Mental Health Treatment for Almost 50 Days, Defendants Placed Him in Segregated Confinement for Nearly One Full Month Before His Release**.

85.    Early in the morning on August 8, 2017, after almost 50 days without meaningful mental health care, Mr. Suarez decompensated and was involved in an altercation with Corrections Officer Kessler. Defendant DOCCS, in an Unusual Incident Report about the incident, stated that during the encounter Mr. Suarez was "acting unpredictable" – so unpredictable, in fact, that Defendant DOCCS informed the *state police* of Mr. Suarez's behavior.

86.     John Bendheim—a DOCCS physician—evaluated Mr. Suarez immediately following the incident. Dr. Bendheim noted that Mr. Suarez was lethargic and was "off by 2 days with current date." Dr. Bendheim also observed that Mr. Suarez's "baseline responsiveness [was] mildly diminished by severe mental disease," and noted Mr. Suarez's "history of severe psychiatric illness, including the use of antipsychotic medications, history of severe manic bipolar disorder, history of schizoaffective disorder, [and] history of unspecified mood disorder."

87.    Considering these factors, Dr. Bendheim cleared Mr. Suarez to return to the general population Forensic Diagnostic Unit with an emergency referral to Defendant Lahey for

a more complete mental health evaluation. Instead of returning Mr. Suarez to the Forensic

Diagnostic Unit, however, Defendant DOCCS inexplicably placed Mr. Suarez into segregated

confinement, specifically the Special Housing Unit ("SHU").

88.     Upon Mr. Suarez's arrival in SHU, Officer Kessler issued him a misbehavior

report. The misbehavior report alleged that while Officer Kessler was escorting Mr. Suarez to his

cell after an alleged disturbance in the mess hall, Mr. Suarez "became loud and disruptive,

refusing direct orders to stop talking" and later kicked him.

89.     The misbehavior report charged him with Assault on Staff [100.11], Threats

[102.10], Disturbance [104.13], Harassment [107.11], and Disobeying a Direct Order [106.10].

Standing alone, each of these alleged offenses subjected Mr. Suarez to a possible segregated

confinement sanction of thirty or more days. Collectively, a guilty finding on these charges

carried a possible maximum segregated confinement sanction of 210 days.

90.     Later in the day, Defendant OMH saw Mr. Suarez for a SHU admission mental

health screening. Despite Mr. Suarez's S-designation and Dr. Bendheim's findings earlier that

day that Mr. Suarez was experiencing mental health symptomology, OMH made no notes about

Mr. Suarez's mental state and did not recommend Mr. Suarez's diversion from segregated

confinement. This was in stark contrast to the DOCCS report indicating his behavior was

unpredictable and aberrant.

91.     Mr. Suarez remained locked in SHU for the next eight days with no mental health

attention. Defendant OMH's failure to afford Mr. Suarez mental health attention during this

eight-day period violated Defendant OMH's policies concerning mental health treatment for

people in segregated confinement.

92.     For example, Defendant OMH's policies require a designated clinician to conduct mental health rounds in SHU every business day. Mr. Suarez, however, did not see a clinician cell-side, or at all, for the first eight days he spent in SHU.

93.     Similarly, Defendant OMH's policies required Defendant Lahey, in his capacity as the Mental Health Unit Chief and ultimate authority for the provision of mental health treatment at Downstate, to conduct mental health rounds in SHU a minimum of once per week. Mr. Suarez, however, never saw Defendant Lahey conduct rounds.

94.     While people with an S-designation are by policy supposed to have a confidential mental health interview during their first week in SHU, Mr. Suarez was offered none. Mr. Suarez's mental health deteriorated significantly due to Defendant OMH's failure to provide these and other mental health services during this eight-day period.

95.     Defendant DOCCS's failure to divert Mr. Suarez from segregated confinement violated DOCCS' responsibilities under the New York State SHU Exclusion Law.

96.     The SHU Exclusion Law was enacted specifically to protect incarcerated people diagnosed with serious mental illness from being housed in segregated confinement after receiving misbehavior reports. When the New York State Legislature passed the first portions of the SHU Exclusion Law in 2008, it made the following findings:

> 1.     The legislature finds that the needs of inmates with serious mental illness should be served by improved access to mental health treatment during incarceration. In particular, inmates with serious mental illness should be offered therapeutic care and treatment in residential mental health settings when doing so will not compromise the safety of inmates or other persons or the security of the facility. While in exceptional circumstances segregated confinement may sometimes be necessary to maintain such safety and security, even for inmates with serious mental illness, the state should strive to maintain such inmates with serious mental illness in less restrictive settings whenever it can safely do so.

2.      When inmates with serious mental illness are placed in segregated confinement, they should receive a heightened level of care, including out-of-cell therapeutic programming and/or mental health treatment, when consistent with the safety of the inmate and other persons or the security of the facility. Such inmates with serious mental illness should also undergo periodic reassessments of their mental condition to determine whether diversion from segregated confinement to a less restrictive setting is appropriate.

Convicted Persons with Serious Mental Illness – Confinement Conditions – Treatment, 2008 Sess. Law News. Of N.Y. Ch. 1 (S. 6422) (McKinney's).

97.     The SHU Exclusion Law requires Defendant DOCCS to "divert or remove inmates with serious mental illness . . . from segregated confinement (Special Housing Unit or Keeplock confinement) when the period of segregated confinement could potentially be longer than 30 days." N.Y. Correct. Law §§ 2(23), 137(6)(d)(i).

98.     Instead, such individuals must be sent to therapeutic alternative placement called a "Residential Mental Health Treatment Unit" unless "exceptional circumstances" justify retaining the person in segregated confinement. N.Y. Correct. Law § 137(6)(d)(ii)(E). New York law carefully defines these "exceptional circumstances" and the procedures by which they may be determined. N.Y. Correct. Law §§ 2.23, 137(6)(d)(i), 137(6)(d)(ii)(C).

99.     Defendant DOCCS should have diverted Mr. Suarez to a Residential Mental Health Unit pursuant to this law, but it did not.

100.    Defendants documented no "exceptional circumstances" that justified Defendant DOCCS' failure to divert Mr. Suarez from segregated confinement to a Residential Mental Health Unit. Defendants Lahey and Morton had responsibility for making this finding, but nonetheless failed to do so.

101.    The SHU Exclusion Law also requires Defendant OMH to offer a "heightened level of care" to people with serious mental illness who are not diverted or removed from

segregated confinement. A "heightened level of care" consists of at least two hours per day, five days per week, of out-of-cell therapeutic treatment and programming. N.Y. Correct. Law § 137(6)(d)(iii).

102.    This "heightened level of care" must be provided unless Defendant OMH determines, in writing, that the person does not require such care, or DOCCS personnel documents that providing such care would create an unacceptable risk to the safety and security of incarcerated people or staff.

103.    Neither Defendant OMH nor Defendant DOCCS made any such finding that Mr. Suarez did not require heightened care. Defendant OMH simply failed to offer it to Mr. Suarez. Instead, Mr. Suarez languished in segregated confinement without any meaningful clinical contact. Defendants' failure to afford Mr. Suarez heightened care while he was in segregated confinement represents yet another colossal failure to treat Mr. Suarez's serious mental illness as required by the Constitution, federal law, and the SHU Exclusion Law.

104.    Defendants failure to divert Mr. Suarez from segregated confinement and afford Mr. Suarez a "heightened level of care" during his stint in segregated confinement persisted until Mr. Suarez's release from Defendant DOCCS' custody and caused a major decompensation of Mr. Suarez's mental health.

<u>Defendants Failed to Divert Mr. Suarez Out of Segregated Confinement After He Received a 30-Day Segregated Confinement Sanction.</u>

105.    On or about August 15, 2017, in front of Defendant Horan, Defendant DOCCS began Mr. Suarez's disciplinary hearing on the charges that had landed him in SHU.

106.    The next day, Defendant Baker met with Mr. Suarez to continue conversations about Mr. Suarez's discharge plan. During these conversations, Defendant Baker again noted Mr. Suarez's medication refusal and Defendant OMH's desire to pursue an AOT order for Mr.

20

Suarez upon his release due to his history of noncompliance with treatment and medication. Defendant Baker noted that OMH would pursue AOT without Mr. Suarez's consent, but again failed to educate Mr. Suarez on the importance of medication compliance during his incarceration. Defendant OMH provided no further clinical contact for at least a week.

107.    On August 21 and 22, 2017, Defendant DiNardo presented confidential mental health testimony at Mr. Suarez's disciplinary hearing. This testimony afforded Defendant OMH yet another opportunity to recommend Mr. Suarez's removal from the well-known, dangerous conditions in segregated confinement. Instead, Defendant DiNardo's testimony did not result in any mitigation of Mr. Suarez's disciplinary penalty. Similarly, on August 22, 2017, Defendant OMH conducted its 14-day Special Housing Unit review and again failed to recommend that Defendant DOCCS divert Mr. Suarez out of the SHU and into a therapeutic alternative placement, despite the requirements of the SHU Exclusion Law.

108.    Later that same day, Defendant Horan found Mr. Suarez guilty of the disciplinary charges of creating a disturbance [104.13], assault on staff, [100.11], and refusing a direct order [106.10]. As a penalty, Defendant Horan sentenced Mr. Suarez to 14 days of time-served in the Special Housing Unit in addition to 60 days of Keeplock time with 30 days suspended and 180 days deferred. With this penalty, Defendant Horan sentenced Mr. Suarez to an additional 30 days of segregated confinement time, as New York State law defines Keeplock as segregated confinement. N.Y. Correct. Law § 2(23).

109.    Defendant Horan issued this penalty despite his knowledge of Mr. Suarez's serious mental illness, S-designation, acute mental health symptoms, and eligibility for a diversion from SHU under New York law.

110.    In his disposition, Defendant Horan noted that "inmate's mental health issues were taken into consideration. Suspended portion of sanctions was made as a result of taking his mental health issues into consideration." Defendant Horan later noted that "sanctions are not excessive and due to mental health issues have been (partially) suspended." Even with this suspension, however, Mr. Suarez's sanction met the "possibility of 30 days" criteria in the SHU Exclusion Law and provided yet another justification for his diversion from segregated confinement.

111.    On or about August 23, 2017, Defendant Morton reviewed Mr. Suarez's disciplinary sentence pursuant to his obligations under New York law.

112.    Defendant Morton stated that he was reviewing Mr. Suarez's sentence because "mental health [was] at issue during the hearing process (confinement imposed exceeds 30 days)," and "confinement sanction is more than 30 days." The document that Defendant Morton reviewed indicated that the penalty imposed was 44 days of total segregated confinement.

113.    Defendant Morton unjustifiably refused to amend Mr. Suarez's penalty. In the "reason for decision" field, Defendant Morton simply stated, "this penalty should not be reduced." As a result, Mr. Suarez was subjected to further segregated confinement time, which resulted in a serious diminution of Mr. Suarez's mental health.

114.    At no time did Defendants Morton and Lahey review the sanction as members of the Joint Case Management Committee.

115.    Mr. Suarez had 29 days remaining in his sentence when he was first placed in segregated confinement and spent all of them in segregated confinement.

116.    Because Defendants knew Mr. Suarez suffered from a serious mental illness, they should have provided him with a reasonable accommodation for his condition and refrained from

placing him in segregated confinement, a punishment that reasonably competent correctional officials would expect to exacerbate his illness.

117.    The day after Defendant Morton ratified Mr. Suarez's disciplinary sanction, Defendant OMH again documented that Mr. Suarez was continuing to refuse to take his psychiatric medication. But Defendant OMH merely committed to follow-up with Mr. Suarez *four weeks* later. Defendant OMH was aware that by that time, Defendant Suarez would be out of prison.

118.    The next day, Defendant OMH sent Mr. Suarez's AOT petition to the New York State Office of the Attorney General, consistent with state policy. Defendant Reynolds met with Mr. Suarez that day. Defendant Reynolds explained to Mr. Suarez that the goal of AOT is to reduce his symptoms, likelihood of hospitalization, and risk of reincarceration. Defendant Reynolds documented that Mr. Suarez's medication noncompliance increased his suicide risk. He also documented that Mr. Suarez had been refusing his medication since June 30, 2017, but did nothing to address this refusal. Defendant Reynolds simply left Mr. Suarez in segregated confinement untreated and unmedicated.

119.    That same day, Defendant Baker confirmed that Mr. Suarez's AOT application had been mailed to the office of the New York State Attorney General. But Defendant Baker also left Mr. Suarez in segregated confinement, untreated and unmedicated.

120.    From August 25, 2017 through September 5, 2017, the day of his release from prison, Mr. Suarez had no contact with mental health staff and was afforded no mental health treatment – not cell-side treatment, confidential psychiatric treatment, or any other form of treatment. He was merely afforded discharge planning, and his discharge planners took no action to respond to his serious mental health symptoms.

<u>Defendants Released Mr. Suarez from Prison Directly from the Segregated Confinement
Cell in Which he Had Decompensated</u>

121.    On September 5, 2017, Defendants released Mr. Suarez from prison, sending him

from segregated confinement directly to the outside world, unmedicated and in active psychosis.

122.    Defendants gave Mr. Suarez a copy of his discharge plan, a Medicaid card, a

medication notification letter, and his AOT order. Defendants did not, however, give Mr. Suarez

a bridge prescription for medication or any other services, despite his condition upon his release.

Defendants were aware of the risks they created.

123.    Just before his release, on or about September 2, 2017, Mr. Suarez's mother

observed that he was exhibiting behaviors she knew were consistent with a psychotic episode

and a lack of medication. She implored employees of Defendant DOCCS to provide Mr. Suarez

with adequate care for his serious mental illness, but they did not.

124.    On the morning of his release, while meeting with Mr. Suarez to review his

discharge plan, DOCCS employee Samantha L. Balestriere noted that Mr. Suarez displayed "[a]

slightly inappropriate affect during report" and noted that "[patient] has not been medicated since

6/2017."

125.    The day after his release to her home, Mr. Suarez's mother took him to a

mandatory appointment with his parole officer, as required. Parole Officer Andrew C. Urban

documented that "p[atient] appears to be in need of medication. [Patient] will be evaluated by

doctor at Silver Lake MICA."

126.    Mr. Suarez's mother implored Mr. Urban to get mental health help for Mr.

Suarez. The parole officer acknowledged that Mr. Suarez needed such attention but said there

was nothing he could do. After returning to his mother's home that afternoon, while experiencing

active psychosis, Mr. Suarez repeatedly stabbed his mother.

127.    Mr. Suarez was charged with attempted murder, assault, and criminal possession of a weapon. Upon his remand to the custody of the New York City Department of Correction, he was immediately designated as unfit to proceed with his criminal case pursuant to New York Criminal Procedure Law § 730. This indicated that Mr. Suarez was not fit to assist in his own defense due to a mental disease or defect. Pursuant to his subsequent § 730 exam, he was committed to Kirby for restoration to competency.

128.    After Mr. Suarez was medicated, he was restored to competency and his criminal case commenced.

129.    Richmond County District Attorney Michael McMahon consented to the entry of a "not-guilty by reason of insanity" plea in the criminal case. Upon information and belief, this was the first such plea consented to by the Richmond District Attorney in nearly two decades.

## IV.    Defendants are Aware of the Cruelty of Confining People with Serious Mental Illness in Isolation.

130.    Long-term isolation was first developed as a penological strategy by Quaker reformers in Philadelphia, who believed that if convicted persons were confined alone with a Bible and given time to reflect, they would realize their mistakes and repent. Holly Boyer, *Note: Home Sweet Hell: An Analysis of the Eighth Amendment's 'Cruel and Unusual' Clause As Applied to Supermax Prisons*, 32 Sw. U. L. Rev. 317, 326 (2003).

131.    The Walnut Street Jail in Philadelphia, established in 1790, became a model for the development of "penitentiaries" nationwide, and the practice of isolating incarcerated individuals from all human contact (including speech, excepting the speech of religious advisors and official visitors) came to be known as the "Pennsylvania system." Melvin Gutterman, *Prison Objectives and Human Dignity: Reaching a Mutual Accommodation*, 1992 B.Y.U. L. Rev. 857, 862 (1992). In that jail, detained individuals would be taken to their cells with hoods over their

heads and would be confined in the same cell throughout the entire term of their sentence. They would have no contact with other people in custody and only the most limited contact with prison staff, to allow for the most possible time for personal reflection and self-improvement. Sally Mann Romano, *Comment: If The SHU Fits: Cruel And Unusual Punishment At California's Pelican Bay State Prison*, 45 Emory L. J. 1089, 1094 (1996).

132.    The reformers of the day believed that the Pennsylvania system would also save the state money, because there would be no need to train guards to manage people in custody, to escort prisoners to services, or to supervise their work. *Id*. at 864.

133.    The Pennsylvania system, however, failed to rehabilitate individuals and instead regularly made their mental health deteriorate.[1] As Charles Dickens wrote in 1842, upon his observation of persons confined in Eastern State Penitentiary: "He is a man buried alive; to be dug out in the slow round of years; and in the meantime dead to everything but torturing anxieties and horrible despair." Charles Dickens, *American Notes* 121-22 (1961).

134.    "The human toll wrought by extended terms of isolation long has been understood, and questioned, by writers and commentators." *Davis v. Ayala*, 135 S.Ct. 2187, 2210 (2015) (Kennedy, J., concurring). Over 125 years ago, the United States Supreme Court acknowledged that even for detainees sentenced to death, segregated confinement carries with it "a further terror and peculiar mark of infamy." *In re Medley*, 134 U.S. 160, 170 (1890). As the Court described:

---

[1] "The Quakers have long since apologized for their role in the development of solitary confinement, and, through the American Friends Service Committee, they are working to end the practice and shut down the [correctional] facilities in which it is practiced." ACLU of Maine, *Change is Possible: A Case Study of Solitary Confinement Reform in Maine*, March 2013, at 5, *available online at* https://www.aclumaine.org/sites/default/files/field_documents/aclu_solitary_report_webversion.pdf (last visited Sept. 1, 2020) (citing *Reassessing Solitary Confinement: The Human Rights, Fiscal, and Public Safety Consequences, Before the Subcomm. on the Constitution, Civil Rights, and Human Rights of the Senate Comm. on the Judiciary, 112th Cong*. (2012) (statement of American Friends Service Committee) (discussing AFSC's solitary reform efforts).

> A considerable number of the prisoners fell, after even a short
> confinement, into a semi-fatuous condition, from which it was next
> to impossible to arouse them, and others became violently insane;
> others still, committed suicide; while those who stood the ordeal
> better were not generally reformed, and in most cases did not
> recover sufficient mental activity to be of any subsequent service
> to the community.

*Id.*; *see also Davis*, *supra* (discussing academic literature decrying segregated confinement and concluding that "[y]ears on end of near-total isolation exact a terrible price"). At the very least, "segregated confinement imprints on those that it clutches a wide range of psychological scars." *Apodaca v. Raemisch*, No. 17-1284, 2018 WL 4866124, at *3 (U.S. Oct. 9, 2018) (statement of Sotomayor, J., respecting denial of *certiorari*). There is clear scientific consensus that segregated confinement inflicts grave psychiatric injury. Long-term isolation produces clinical effects that are similar to those produced by physical torture. It leads to increases in suicide rates, and even mentally healthy individuals find the experience extremely difficult to endure.[2] According to the American Psychiatric Association, segregated confinement is associated with increased risk of self-mutilation and suicidal ideation, greater anxiety, depression, and paranoia.[3] About half of all prison suicides happen among the roughly five to six percent of individuals held in isolation.[4]

135.    Renowned psychiatrist Terry Kupers summarized the existing research concerning the impact of long-term isolation, applied to individuals confined in Supermax solitary units:

> *Every* prisoner placed in an environment as stressful as a supermax
> unit, whether especially prone to mental breakdown or seemingly
> very sane, eventually begins to lose touch with reality and exhibit

---

[2] ACLU of Maine, *Change is Possible: A Case Study of Solitary Confinement Reform in Maine*, March 2013, at 7, *available online at* https://www.aclumaine.org/sites/default/files/field_documents/aclu_solitary_report_webversion.pdf (last visited Sept. 1, 2020)

[3] *Segregated Confinement of Juvenile Offenders*, Am Psych. Ass'n, https://www.apa.org/advocacy/criminal-justice/solitary.pdf (last visited Sept. 1, 2020).

[4] Am. Civ. Liberties Union, *Caged In: Segregated Confinement's Devastating Harm on Prisoners with Physical Disabilities* 25 (2017), https://www.aclu.org/report/caged-devastating-harms-segregated-confinement-prisoners-physical-disabilities (last visited Sept. 1, 2020).

> some signs and symptoms of psychiatric decompensation, even if
> the symptoms do not qualify for a diagnosis of psychosis. . . Even
> inmates who do not become frankly psychotic report a number of
> psychosis-like symptoms, including massive free-floating anxiety,
> hyper-responsiveness to external stimuli, perceptual distortions and
> hallucinations, a feeling of unreality, difficulty with concentration
> and memory, acute confusional states, the emergence of primitive
> aggressive fantasies, persecutory ideation, motor excitement,
> violent destructive or self-mutilatory outbursts, and rapid
> subsidence of symptoms upon termination of isolation.

Terry Kupers, M.D., *Prison Madness: The Mental Health Crisis Behind Bars and What We Must Dd About It*, 56-57 (1999) (emphasis added).

136.     Not only does prolonged isolation have disastrous effects on individuals' mental health, but these effects are frequently irreversible. As Dr. Kupers explained, "destroying a prisoner's ability to cope in the free world is the worst thing a prison can do."[5]

137.     Cognition deteriorates in isolation. Many people held in segregated confinement experience hallucinations and delusions, and some suffer full-blown psychosis.

138.     Quite aptly, 25 years ago, a federal district judge explained that placing individuals with mental illness in solitary confinement is "the mental equivalent of putting an asthmatic in a place with little air to breathe." *Madrid v. Gomez*, 889 F. Supp. 1146, 1265 (N.D. Cal. 1995).

139.     In segregated confinement, which includes placement in the SHU or Keeplock, individuals are confined in small cells for twenty-three hours each day. Single cells in DOCCS are approximately six feet by ten feet. People confined in SHU and Keeplock are also made to eat alone in their cells and are prohibited from seeing other incarcerated individuals, working at prison jobs, attending programs, or engaging in other rehabilitative activities.

---

[5] An Act to Ensure Humane Treatment for Special Management Prisoner: Hearing on LD 1611 Before the Joint Committee on Criminal Justice and Public Safety, 124th Legis., 2nd Reg. Sess. (Maine, Feb. 17, 2010) (statement of Terry Kupers, M.D.).

140.     People with histories of psychiatric illness are particularly vulnerable to increased mental suffering and injury from segregated confinement. Due to the social deprivation, idleness, and absence of meaningful psychiatric treatment, individuals with serious mental illness placed in segregated confinement are at high risk of psychological deterioration and psychiatric decompensation.

141.     The stresses, social isolation, and restrictions of segregated confinement can exacerbate existing mental illness or provoke a reoccurrence of psychiatric symptoms, immeasurably increasing pain and suffering. Individuals with psychiatric disorders are particularly predisposed to psychotic breakdown and extreme impulsivity after being placed in segregated confinement. Left with no way to socialize with others, individuals with mental illness placed in segregated confinement grow increasingly anxious, angry, distrustful, and paranoid.

142.     The torturous effects of segregated confinement on individuals with serious mental illnesses have caused the public, including in New York, to demand reforms to segregated confinement in general and its use for vulnerable populations.

143.     In 2002, Disability Advocates, Inc., The Legal Aid Society Prisoners' Rights Project, Prisoners' Legal Services of New York, and Davis Polk & Wardwell, LLP brought *Disability Advocates, Inc. v. New York State Office of Mental Health*, a lawsuit challenging on constitutional and ADA grounds New York's overuse of segregated confinement as a mental health intervention. Five years later, that lawsuit settled with a comprehensive agreement requiring Defendants DOCCS and OMH to limit their use of segregated confinement for this population and increase treatment alternatives, including Residential Mental Health Treatment Units.

144.     Concomitantly, a grassroots movement of concerned family members, formerly incarcerated people, and advocates demanded that the State change these practices that had been acknowledged as torture for years.

145.     Over the next several years and after several legislative hearings at which testimony was gathered, the New York State Assembly Standing Committee on Correction and the New York State Assembly Standing Committee on Mental Health recognized that incarcerated people with serious mental illnesses are vulnerable to deterioration in segregated confinement. The SHU Exclusion Law – supported by legislative majorities – was signed into law in 2008.

146.     Eventually, Defendant DOCCS acknowledged the particularly devastating toll segregated confinement takes on mentally ill people in custody, when, in 2013, it initiated rule-making—subject to notice and comment by members of the public—on the issue of segregated confinement and began reassigning more people with mental illnesses to facilities with therapeutic resources.

147.     Defendants are aware that several people with serious mental illness have tragically died in New York State prisons as a direct result of Defendants' failure to afford minimally adequate mental health treatment. For example, the 2014 and 2015 deaths of Benjamin Van Zandt and Karl Taylor show the tragic impact of Defendants' failures to engage people in mental health treatment, and Defendants overreliance on segregated confinement and other forms of isolation as housing for people with serious psychiatric treatment needs.[6]

---

[6] See Tom Robbins, *Why is Karl Taylor Dead? Our Prisons are our Mental Health Wards. One Fatal Case in New York Shows Where That Can Lead*, The Marshall Project, Nov. 27, 2018, *available online at* https://www.themarshallproject.org/2018/11/27/why-is-karl-taylor-dead ("But Taylor otherwise refused to engage when social workers and doctors sought to draw him out. In her notes, Kristie Sneckenberg, a psychologist in the crisis treatment program, described Taylor sitting on his bed, talking to the wall. 'If you are black, you're in more trouble than if you're white,' she heard him mumble. Other times, he would stand at the gate talking loudly to himself 'as if he was teaching a class.' Concerned that Taylor was steadily deteriorating, Sneckenberg recommended

148.     As recently as 2019, with pressure mounting for the Legislature to pass the

Humane Alternatives to Long Term Segregated Confinement Act, Defendant DOCCS agreed to

further curb the use of segregated confinement, particularly for people with serious mental illness

and people with other "special conditions."

149.     The New York City Department of Correction, responding to current events and

public pressure, has likewise moved to curb its overreliance on segregated confinement,

particularly for vulnerable populations. In August 2014, the United States Department of Justice

("DOJ") issued an investigative report on conditions at Rikers Island. DOJ found, among other

things, that the City improperly relied on segregated confinement as a tool to manage adolescent

detainees, "expos[ing] them to a risk of serious harm" and raising serious constitutional

concerns. DOJ found that putting adolescents in segregated confinement created a "vicious

cycle." Unstable detainees became *more* unstable when they were put in segregated confinement,

isolated from social support and necessary services, and given little incentive to improve their

behavior.[7]

150.     In October 2014, the *New Yorker* told the story of Kalief Browder, a teenager who

spent three years on Rikers Island after being accused of stealing a backpack.[8] Mr. Browder

spent nearly 17 consecutive months in isolation before the charges against him were dismissed.

While in segregated confinement, he became paranoid and repeatedly attempted to take his life.

After he was released, he had constant flashbacks to his time in segregated confinement and

---

that he be sent back to Central New York [Psychiatric Center] to receive medication under a court order. Most of the
mental-health staff concurred. When nothing happened, Sneckenberg sent an urgent email—later produced as an
exhibit for her deposition in the lawsuit—to the unit's doctors. 'What are we doing with this????' she wrote.") (last
visited Sept. 1, 2020).

[7] *See* U.S. Dep't of Justice, *CRIPA Investigation of the New York City Department of Correction Jails on Rikers
Island*, Aug. 4, 2014, https://www.justice.gov/sites/default/files/usao-
sdny/legacy/2015/03/25/SDNY%20Rikers%20Report.pdf (last visited Sept. 1, 2020).

[8] Jennifer Gonnerman, *Before the Law*, The New Yorker, Oct. 6, 2014, https://www.newyorker.com
/magazine/2014/10/06/before-the-law (last visited Sept. 1, 2020).

made more attempts to end his life. Mr. Browder took his own life less than a year after the article was published.

151.    Both developments brought public attention to the gross overreliance on segregated confinement. And they happened against a backdrop of growing societal recognition of the harm of segregated confinement.

152.    In this context, in January 2015, the New York City Board of Correction adopted a regulation banning segregated confinement for detainees age 21 and younger in New York City (the "Under Age 22 Solitary Ban").[9]

153.    In promulgating the Under Age 22 Solitary Ban, the Board found, after a notice-and-comment period: "[P]unitive segregation is a severe penalty that should not be used in certain circumstances in [New York City Department of Correction] facilities. In particular, punitive segregation reflects a serious threat to the physical and psychological health of adolescents, with respect to whom it should *not* be imposed."

154.    In addition to categorically barring correctional officials from placing persons under 22 years old in segregated confinement, the New York City Board of Correction's regulations also forbid officials from using segregated confinement for "inmates with serious mental or serious physical disabilities or conditions." 40 R.C.N.Y. §1-17(b)(1)(iii). In addition, the Board also empowered Department medical staff to remove a person from segregated confinement "when assignment to punitive segregation would pose a serious threat to an inmate's physical or mental health." 40 R.C.N.Y. §1-17(b)(2).

---

[9] The Board is an independent body of the City of New York that is responsible for overseeing and evaluating the performance of the New York City Department of Correction. The Board is required to establish Minimum Standards for the treatment of detainees held by the City. *See* Charter of the City of New York § 626. Those Minimum Standards are regulations with binding legal effect, codified in the Rules of the City of New York, which DOC is obligated to follow. Rules of the City of New York tit. 40.

155.    The City of New York's Under Age 22 Solitary Ban received glowing press coverage and praise from advocates for detainees' rights. Mayor de Blasio trumpeted that New York City would now "be at the forefront of national jail reform efforts."[10]

156.    Multiple other states, through their elected and appointed officials, have banned the placement of mentally ill prisoners in segregated confinement altogether or otherwise drifted away from its use. For instance, correctional leaders in Michigan reformed segregation practices through incentive programs that reduced the length of stays in isolation and the number of persons subject to such segregation. In 2012, the Massachusetts Department of Corrections began rewriting policies to exclude people with serious mentally illness from segregated confinement pursuant to a settlement of a lawsuit that attacked the punishment as inhumane. In January 2013, the Illinois Department of Corrections closed its supermax prison, Tamms Correctional Center, which was designed to house prisoners in complete isolation. Colorado and Pennsylvania also both agreed to stop placing people with serious mentally illness in segregated confinement in 2014 and 2015, respectively.

157.    State agencies and legislative bodies in other states have acknowledged the particularly cruel nature of the segregated confinement of people with mentally illness by taking significant steps to limit the practice. As part of a class action settlement in 2014, the Arizona Department of Corrections implemented reforms providing people with mental illness in segregated confinement more access to mental health treatment and time outside of their cells. In Nebraska, a bipartisan legislative commission formally recommended to the state's Corrections

---

[10] *See, e.g., Mark Berman, New York City Will No Longer Put Its Youngest Prison Inmates in Segregated Confinement*, Wash. Post, Jan. 13, 2015, https://www.washingtonpost.com/news/post-nation/wp/2015/01/13/new-york-city-will-no-longer-put-its-youngest-prison-inmates-in-solitary-confinement/ (last visited Sept. 1, 2020).

Department "significant reduction in the use of segregated confinement, beginning with removing the mentally ill and the cognitively impaired."

158.    Even the legal profession, with its inherent lagging indicator regarding public views of issues of national importance, has reached the consensus that solitary confinement is out of touch with modern morals and should not be imposed on people with serious mental illness. For instance, the American Bar Association Standards for Criminal Justice state that "[n]o prisoner diagnosed with serious mental illness should be placed in long-term segregated housing." ABA Standards for Criminal Justice, Treatment of Prisoners, 23-2.8(a). They further state that no person, regardless of mental health status, should be in solitary confinement for more than 24 hours "without a mental health screening, conducted in person by a qualified mental health professional, and a prompt comprehensive mental health assessment if clinically indicated." *Id*. at 23-2.8(b). The standards continue: "If the assessment indicates the presence of a serious mental illness, or a history of serious mental illness and decompensation in segregated settings, the prisoner should be placed in an environment where appropriate treatment can occur. Any prisoner in segregated housing who develops serious mental illness should be placed in an environment where appropriate treatment can occur." *Id*.

159.    This growing tide evidences a national sentiment that segregated confinement of people with serious mental illness does not comport with a humane standard of punishment in modern society.

**FIRST CLAIM FOR RELIEF**
**42 U.S.C. § 1983**
**(Against the Supervisory Defendants and the Individual Defendants)**

160.    Mr. Suarez incorporates by reference each and every allegation contained in the foregoing paragraphs as if specifically alleged herein.

161.     By their conduct and actions, the Supervisory Defendants and the Individual Defendants, acting under color of law and without lawful justification, intentionally or with reckless disregard for Mr. Suarez's rights placed Mr. Suarez in segregated confinement in spite of their knowledge that he has serious psychiatric treatment needs, in violation of his constitutional rights as guaranteed under the Eighth Amendment of the United States Constitution, through 42 U.S.C. § 1983, including the right to be free from cruel and unusual punishment.

162.     As a direct and proximate result of the conduct of the Supervisory and Individual Defendants, Mr. Suarez suffered substantial and foreseeable physical and emotional harm and was otherwise damaged and injured.

## SECOND CLAIM FOR RELIEF
### 42 U.S.C. § 1983
### (Against the Supervisory Defendants and the Individual Defendants)

163.     Mr. Suarez incorporates by reference each and every allegation contained in the foregoing paragraphs as if specifically alleged herein.

164.     The Supervisory Defendants and the Individual Defendants exhibited deliberate indifference to Mr. Suarez's known, serious psychiatric treatment needs when they failed to provide Mr. Suarez with proper treatment, thus depriving him of his rights, privileges, and immunities in violation of 42 U.S.C. § 1983 and his rights guaranteed by the Eighth Amendment to the United States Constitution.

165.     The Supervisory Defendants and the Individual Defendants had actual knowledge of Mr. Suarez's serious psychiatric treatment needs and serious risk of mental decompensation and psychosis. They also had knowledge of his propensity for violence when off his medication.

Defendants clearly documented these needs and propensities in Mr. Suarez's mental health and correctional records, many of which Defendants either reviewed or generated themselves.

166.    Mr. Suarez's mental health history, including his history of medication and treatment noncompliance, frequent inpatient hospitalizations, and longstanding prescriptions for psychotropic medication were also known to the Supervisory Defendants and the Individual Defendants. This history was documented in Mr. Suarez's mental health and correctional records, which were accessible to, reviewed by, or generated by the Supervisory Defendants and the Individual Defendants. This history was also documented in Mr. Suarez's Corrections-Based Operations files, MHARS, PSYCHES, and other databases accessible to the Supervisory Defendants and the Individual Defendants.

167.    Based on the Supervisory and Individual Defendants' knowledge of Mr. Suarez's serious psychiatric treatment needs, DOCCS issued an S-designation to Mr. Suarez. Despite this, the Supervisory Defendants and the Individual Defendants failed to provide Mr. Suarez the mental health treatment to which he was constitutionally entitled.

168.    The Supervisory Defendants and the Individual Defendants acted under color of state law to willfully and knowingly deprive Mr. Suarez of his constitutional rights secured the Eighth Amendment to the United States Constitution and made enforceable through 42 U.S.C. § 1983.

169.    As a direct and proximate result of the Supervisory and Individual Defendants' deliberate indifference to Mr. Suarez's known serious psychiatric treatment needs, Mr. Suarez sustained damages alleged herein.

## THIRD CLAIM FOR RELIEF
### Title II of the Americans with Disabilities Act
### (Against Defendant Annucci, Defendant Sullivan, and the Agency Defendants)

170.    Mr. Suarez incorporates by reference each and every allegation contained in the foregoing paragraphs as if specifically alleged herein.

171.    Title II of the Americans with Disabilities Act of 1990 ("ADA") and its implementing regulations prohibit a public entity from excluding or denying people with disabilities the benefits of its services, programs, or activities or otherwise discriminating based on disability. 42 U.S.C. § 12132; 28 C.F.R. §§ 35.104 and 35.130(a).

172.    The Agency Defendants are public entities as defined under 42 U.S.C. § 12131(1)(B).

173.    Prohibited disability-based discrimination by public entities includes the failure to provide qualified individuals with disabilities an equal opportunity to participate in or benefit from aids, benefits, or services or "otherwise limit" a qualified individual with a disability in the enjoyment of any right, privilege, aid, benefit, or service. 28 C.F.R. § 35.130(b)(1)(h) & (vii).

174.    Mr. Suarez is a qualified individual with a disability as defined in the ADA. He has impairments that substantially limit one or more major life activity, including but not limited to thinking, concentrating, and interacting with others; he has a record of having such an impairment.

175.    As a person in DOCCS custody with a serious mental illness, Mr. Suarez meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by the Agency Defendants, including rehabilitative programming in the Residential Mental Health Units, and other rehabilitative programming afforded as part of

Defendant DOCCS' disciplinary process. 42 U.S.C. § 12102(2); 42 U.S.C. § 12131(2); 29 U.S.C. § 794.

176.    The Agency Defendants discriminated against Mr. Suarez on the basis of his disability by punishing him for a manifestation of his mental illness, in violation of the ADA. 42 U.S.C. § 12132.

177.    The Agency Defendants discriminated against Mr. Suarez on the basis of his disability by failing to divert him out of segregated confinement into a therapeutic alternative placement—such as a Residential Mental Health Treatment Unit as contemplated by the SHU Exclusion Law—so that a punishment that exacerbated Mr. Suarez's serious mental illness was not imposed, in violation of the ADA. 42 U.S.C. § 12132.

178.    The Agency Defendants discriminated against Mr. Suarez on the basis of his disability by failing to divert him from segregated confinement into a therapeutic alternative placement that would ensure his access to and participation in DOCCS and OMH programming, including the DOCCS disciplinary process, in violation of the ADA. 42 U.S.C. § 12132.

179.    As a direct and proximate result of this discrimination, Mr. Suarez sustained damages alleged herein.

**FOURTH CLAIM FOR RELIEF**
**Section 504 of the Rehabilitation Act of 1973**
**(Against Defendant Annucci, Defendant Sullivan, and the Agency Defendants)**

180.    Mr. Suarez incorporates by reference each and every allegation contained in the foregoing paragraphs as if specifically alleged herein.

181.    Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, provides:

> No otherwise qualified individual with a disability in the United
> States . . . shall, solely by reason of her or his disability, be
> excluded from the participation in, be the denied benefits of, or be

subjected to discrimination under any program or activity receiving
Federal financial assistance . . .

182.    The Agency Defendants are public entities as defined under 42 U.S.C.
§ 12131(1)(B).

183.    The Agency Defendants receive federal financial assistance.

184.    Mr. Suarez is an individual with serious mental illness. He has mental
impairments that substantially limit one or more major life activity, as set forth above.

185.    Mr. Suarez is a qualified individual with a disability within the meaning of 29
U.S.C. § 705(20) and 45 C.F.R. § 84.3(1).

186.    As a person in DOCCS custody with serious mental illness, Mr. Suarez meets the
essential eligibility requirements for the receipt of services or the participation in programs or
activities provided by the Agency Defendants, including rehabilitative programming in the
Residential Mental Health Units, and other rehabilitative programming afforded as part of
Defendant DOCCS' disciplinary process. 29 U.S.C. § 794.

187.    The Agency Defendants discriminated against Mr. Suarez on the basis of his
disability by punishing him for a manifestation of his mental illness, in violation of the ADA. 29
U.S.C. § 794.

188.    The Agency Defendants discriminated against Mr. Suarez on the basis of his
disability by failing to divert him out of segregated confinement into a therapeutic alternative
placement—such as a Residential Mental Health Treatment Unit as contemplated by the SHU
Exclusion Law—so that a punishment that exacerbated Mr. Suarez's serious mental illness was
not imposed, in violation of the ADA. 29 U.S.C. § 794.

189.    The Agency Defendants discriminated against Mr. Suarez on the basis of his
disability by failing to divert him from segregated confinement into a therapeutic alternative

placement that would ensure his access to and participation in DOCCS and OMH programming, including the DOCCS disciplinary process, in violation of the ADA. 29 U.S.C. § 794.

190.    As a direct and proximate result of this discrimination, Mr. Suarez sustained damages alleged herein.

### FIFTH CLAIM FOR RELIEF
### NY Correction Law § 137 (the "SHU Exclusion Law")
### (Against All Defendants)

191.    Mr. Suarez incorporates by reference each and every allegation contained in the foregoing paragraphs as if specifically alleged herein.

192.    For all times relevant to this complaint, Mr. Suarez was a person with a serious mental illness. Defendants OMH, Lahey, and Kulick diagnosed Mr. Suarez with schizoaffective disorder, bipolar type. They subsequently afforded him an S-designation.

193.    The SHU Exclusion Law, NY Correction Law § 137 (6)(d)(i), was codified to minimize the use of segregated confinement as a disciplinary measure for people in state custody with serious mental illness. The SHU Exclusion Law was clearly enacted to prevent incarcerated persons who are diagnosed with serious mental illness and receive misbehavior reports from being housed in segregated confinement.

194.    The SHU Exclusion Law requires that Defendant DOCCS and those working on its behalf "divert or remove inmates with serious mental illness . . . from segregated confinement" when the period of segregated confinement could potentially be longer than 30 days. N.Y. Correct. Law § 137(6)(d)(i). The law requires that in those circumstances, Defendant DOCCS house people with serious mental illness in a Residential Mental Health Unit instead of in segregated confinement unless "exceptional circumstances" justify placing the person into segregated confinement. N.Y. Correct. Law § 137(6)(d)(ii)(E).

195.    Finally, the SHU Exclusion Law requires that people with serious mental illness who are not diverted from segregated confinement be offered a "heightened level of care," which consists of two hours per day, five days per week of out-of-cell therapeutic treatment and programming, unless "exceptional circumstances" apply. N.Y. Correct. Law § 137(6)(d)(iii)(A).

196.    The Supervisory and Individual Defendants violated the SHU Exclusion Law by failing to divert Mr. Suarez out of segregated confinement after he was placed there for a period that Defendants knew could potentially be longer than 30 days.

197.    The Supervisory Defendants violated the SHU Exclusion Law by retaining Mr. Suarez in segregated confinement without determining and documenting that "exceptional circumstances" justified his retention.

198.    The Supervisory and Individual Defendants violated the SHU Exclusion Law by failing to afford Mr. Suarez a "heightened level of care" during his retention in segregated confinement, absent "exceptional circumstances."

199.    As a direct and proximate result of Defendants multiple violations of the SHU Exclusion Law, Mr. Suarez sustained damages alleged herein.

## SIXTH CLAIM FOR RELIEF
### Negligent Supervision and Training
### (Against the Supervisory Defendants and the Agency Defendants)

200.    Mr. Suarez incorporates by reference each and every allegation contained in the foregoing paragraphs as if specifically alleged herein.

201.    The Supervisory Defendants and the Agency Defendants owed a duty of care to Mr. Suarez to prevent his mental decompensation. Under the same or similar circumstances, a reasonably prudent and careful person should have anticipated that Mr. Suarez's mental decompensation and violence would result from the foregoing conduct.

202.    Upon information and belief, the Individual Defendants were unqualified for, and incompetent in, their positions.

203.    The Supervisory Defendants and the Agency Defendants knew or should have known through exercise of reasonable diligence that Defendants they employed were unfit and incompetent for their positions.

204.    The Supervisory Defendants and the Agency Defendants had a duty to properly screen, hire, train, and discipline the Individual Defendants. Upon information and belief, the Supervisory Defendants and the Agency Defendants exercised negligence in screening, hiring, training, disciplining, and ultimately retaining the Individual Defendants.

205.    Upon information and belief, the Supervisory Defendants and the Agency Defendants failed in their duty to sufficiently train the Individual Defendants for their positions as required by New York common law and the SHU Exclusion Law. N.Y. Correct. Law § 401(6).

206.    This negligence was the direct and proximate cause of the harm Mr. Suarez suffered, and his resultant damages.

207.    As a direct and proximate result of the unlawful conduct detailed above, Mr. Suarez sustained the damages alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, Mr. Suarez demands judgment against Defendants individually and jointly and prays for relief:

1.    awarding compensatory damages for the violations of his constitutional, statutory, and common law rights in an amount to be determined at trial;

2.       awarding punitive damages against the Supervisory and Individual

Defendants;

3.       awarding reasonable attorneys' fees, costs, and disbursements under 42 U.S.C.

§§ 1988 and 12205, and 29 U.S.C. § 794a; and

4.       granting such other relief as this Court deems just and proper.


Dated: September 1, 2020                          Respectfully submitted,
        New York, New York


                                        /s/ James J. Beha II
                                        James J. Beha II (jbeha@mofo.com)
                                        Jocelyn E. Greer (jgreer@mofo.com)
                                        MORRISON & FOERSTER LLP
                                        250 West 55th Street
                                        New York, New York 10019
                                        (212) 336-4079

                                        /s/ Stefen R. Short
                                        Stefen R. Short (sshort@legal-aid.org)
                                        Robert M. Quackenbush
                                        (rquackenbush@legal-aid.org)
                                        THE LEGAL AID SOCIETY
                                        Prisoners' Rights Project
                                        199 Water Street, 6th Floor
                                        New York, New York 10038
                                        (212) 577-3530

                                        *Attorneys for Plaintiff Elvin Suarez*