UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
ELVIN SUAREZ,                                               :
                        Plaintiff,                          :
v.                                                          :
                                                            :
ANTHONY J. ANNUCCI, Acting                                  :
Commissioner, New York State Department of                  :
Corrections and Community Supervision, in his               :
individual capacity; ANN MARIE T.                           :
SULLIVAN, Commissioner, New York State                      :
Office of Mental Health, in her individual                  :
capacity; ROBERT MORTON, Superintendent,                    :
Downstate Correctional Facility, in his                     :
individual capacity; RYAN LAHEY, Office of                  :
Mental Health Unit Chief, Downstate                         :
Correctional Facility, in his individual capacity;          :
ABADUL QAYYUM, Psychiatrist, Downstate                      :
Correctional Facility, in his individual capacity;          :
PETER M. HORAN, Supervising Offender                        :        **OPINION AND ORDER**
Rehabilitation Coordinator, Downstate                       :
Correctional Facility, in his individual capacity;          :        20 CV 7133 (VB)
SAMANTHA L. KULICK, Psychology                              :
Assistant 3/Supervisor, New York State Office               :
of Mental Health, in her individual capacity;               :
MAURA L. DINARDO, Clinician, New York                       :
State Office of Mental Health, in her individual            :
capacity; BRANDON N. REYNOLDS,                              :
Psychiatrist, New York State Office of Mental               :
Health, in his individual capacity; CHESNEY J.              :
BAKER, Licensed Master Social Worker                        :
2/Supervisor, New York State Office of Mental               :
Health, in his individual capacity; NEW YORK                :
STATE DEPARTMENT OF CORRECTIONS                             :
AND COMMUNITY SUPERVISION; and                              :
NEW YORK STATE OFFICE OF MENTAL                             :
HEALTH,                                                     :
                        Defendants.                         :
-----------------------------------------------------------------x

Briccetti, J.:

        Plaintiff Elvin Suarez brings this action pursuant to 42 U.S.C. § 1983 against defendants

New York State Department of Corrections and Community Supervision ("DOCCS") Acting

Commissioner Anthony J. Annucci, New York State Office of Mental Health ("OMH")

Commissioner Ann Marie T. Sullivan, Downstate Correctional Facility ("Downstate")

Superintendent Robert Morton, Downstate OMH Unit Chief Ryan Lahey, Downstate Psychiatrist

Abadul Qayyum, Downstate Supervising Offender Rehabilitation Coordinator Peter M. Horan,

OMH Psychology Assistant Samantha L. Kulick, OMH Clinician Maura L. DiNardo, OMH

Psychiatrist Brandon N. Reynolds, OMH Licensed Master Social Worker Chesney J. Baker,

DOCCS, and OMH.  Plaintiff claims the individual defendants violated his Eighth Amendment

rights because they (i) denied him mental health treatment they knew he required, causing him

psychiatric deterioration, and (ii) placed him in and failed to divert him from segregated

confinement despite knowing of his serious mental illness and his risk of psychiatric

deterioration in isolation.  Plaintiff also brings claims against Annucci, Sullivan, DOCCS, and

OMH for violation of Title II of the Americans with Disabilities Act ("ADA") and Section 504

of the Rehabilitation Act ("Rehabilitation Act"), as well as a claim against Lahey, Kulick, and

OMH for violation of New York Correction Law § 137(6) (the "Special Housing Unit ("SHU")

Exclusion Law" or "Section 137(6)"), and a claim against Sullivan and OMH for negligent

supervision and training.

Now pending is defendants' motion to dismiss the amended complaint ("AC") pursuant

to Rule 12(b)(6).  (Doc. #74).

For the reasons set forth below, the motion is GRANTED IN PART and DENIED IN

PART.

The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367.

# BACKGROUND

For the purpose of ruling on the motion to dismiss, the Court accepts as true all well-pleaded factual allegations in the AC and draws all reasonable inferences in plaintiff's favor, as summarized below.

## I.     Mental Health Evaluations at Downstate

Plaintiff alleges that on June 22, 2017, he was placed at Downstate in Fishkill, New York, while serving a sentence for assault stemming from vandalizing police cars and striking a police officer.  Plaintiff alleges that at both his DOCCS intake evaluation and suicide prevention intake screening, he reported his history of mental health treatment and suicidality; schizoaffective disorder, bipolar type diagnosis[1]; and that he had been prescribed Zyprexa, an antipsychotic generally used to treat schizophrenia and bipolar disorder.  Prior to his transfer to Downstate, he had recently spent time in Kirby Forensic Psychiatric Center.

Plaintiff further alleges that on June 23, 2017, OMH Psychology Assistant Kulick conducted plaintiff's mental health admission screening and medication consultation.[2]  Plaintiff alleges he self-reported medication compliance and said his medication effectively treated his symptoms.  Kulick was allegedly required to review plaintiff's mental health records from before his arrival at Downstate, which indicated prior medication refusal and inconsistent engagement in treatment.  He further alleges Kulick confirmed plaintiff's diagnosis of schizoaffective disorder, bipolar type; prescribed him Zyprexa; admitted him to OMH services; and recorded in

---

[1]     It is not clear from the AC whether plaintiff has bipolar disorder in addition to schizoaffective disorder, bipolar type.  Compare Doc. #71 ("AC") ¶¶ 1, 14, 28, 69, 71, 219 with AC ¶¶ 64, 66, 100.  The Court presumes for the purpose of this motion that he has "schizoaffective disorder, bipolar type," but not bipolar disorder.

[2]     OMH, an entity distinct from DOCCS, "enforces the laws and regulations applicable to mental health units within the DOCCS system."  AC ¶ 54.

her admission notes that plaintiff reported he was prescribed medication for mood swings and auditory hallucinations that told him to harm himself.  Plaintiff alleges Kulick "provisionally" classified plaintiff as a "Mental Health Service Level 1, the most severe classification of mental illness."  (AC ¶ 73).  Plaintiff also alleges Kulick provisionally issued plaintiff an "S-designation," which denotes one "has a serious mental illness and is experiencing pronounced mental health symptoms requiring intensive mental health treatment and services."  (Id. ¶ 74).  According to plaintiff, an inmate with an S-designation "required the most intensive mental health services available in the DOCCS system, including daily cell-side clinical contact, weekly confidential contact with a psychiatrist, medication management, comprehensive discharge planning, and other services."  (Id. ¶ 75).

Plaintiff alleges that on or about June 24, 2017, DOCCS transferred him to the Forensic Diagnostic Unit at Downstate, which is jointly operated by DOCCS and OMH.  Plaintiff alleges that until June 30, 2017, he had no contact with OMH staff.

Plaintiff further alleges that on or about June 30, 2017, OMH Unit Chief Lahey officially designated plaintiff a "Level 1-S" patient.  (AC ¶ 77).  Plaintiff also alleges that beginning that day, he began refusing to take his psychotropic medication.  In documenting this refusal, Lahey noted plaintiff was hearing voices, the Zyprexa was not helping, and that he told plaintiff to comply with his prescription.  Plaintiff alleges Lahey said OMH would follow up with plaintiff in two weeks, but took no further action at that time.  According to plaintiff, in so doing, DOCCS, OMH, Downstate Superintendent Morton, Lahey, Downstate Psychiatrist Qayyum, Kulick, and OMH Psychiatrist Reynolds each violated 14 New York Codes, Rules and Regulations ("NYCRR") § 527.8(c)(5)(ii)(a),[3] which required that within 24 hours after plaintiff

---

[3]	Plaintiff incorrectly cites this provision as 14 NYCRR § 527.8(5)(ii)(a).  (AC ¶ 81).

refused his medication, these defendants were required to "formally evaluate" whether administration of the medication was in his best interests and whether plaintiff had the capacity to make a "reasoned decision concerning the administration of [psychotropic] medication."[4]

Plaintiff alleges he next had a follow-up evaluation on July 19, 2017, when Qayyum and Kulick met with him to complete his treatment plan.  Plaintiff alleges both that Kulick noted in his file that plaintiff had mood swings and self-harming tendencies, which he was effectively treating by taking his medication, but also that Kulick and Qayyum's treatment plan stated plaintiff did not need his psychotropic medication.  Plaintiff also claims Kulick noted plaintiff refused to take his prescribed psychotropic medication, but instead of evaluating his need for medication, Kulick discontinued his Zyprexa prescription.

Plaintiff alleges OMH next followed up with him on July 21, 2017, when Kulick conducted a cell-side visit with plaintiff during which she documented his continued medication refusal and set a follow-up appointment for three weeks out.

Plaintiff alleges he was not treated again until August 3, 2017, when he met with OMH social worker Baker, an OMH discharge planner.  Baker's discharge plan allegedly recommended plaintiff continue outpatient treatment and medication and that he enroll in an Assisted Outpatient Treatment ("AOT"), a program authorizing court-ordered treatment in the community for people with severe mental illness at risk of relapse or deterioration absent voluntary compliance with prescribed treatment.  AOT eligibility allegedly requires a person have a history of mental health treatment noncompliance resulting in hospitalization, incarceration, or committing serious acts or threats of violence to self or others.

---

[4]     Below, the Court summarizes several other instances when plaintiff allegedly refused his medication and was not formally evaluated.  Although plaintiff does not specifically allege that, in those instances, Section 527.8(c)(5)(ii)(a) was violated, the Court infers plaintiff to mean this section was violated each time he refused medication but was not formally evaluated.

II.    <u>Segregated Confinement</u>

Plaintiff alleges that on the morning of August 8, 2017, after more than one month of inadequate mental health treatment and counseling regarding his medication refusal, he decompensated and had an altercation with non-party Correction Officer ("C.O.") Kessler. Plaintiff alleges C.O. Kessler issued him a misbehavior report, which stated plaintiff was "loud and disruptive, refusing direct orders to stop talking" and that he had kicked C.O. Kessler.  (AC ¶ 119).  It allegedly charged him with several offenses, each of which subjected him to a possible segregated confinement of thirty or more days, with a possible maximum sentence of segregated confinement of 210 days.  Plaintiff alleges that in consultation with Lahey, Qayyum, Kulick, Reynolds, and Baker, DOCCS placed him in segregated confinement in SHU.

According to plaintiff, later on August 8, 2017, an OMH employee conducted a SHU admission mental health screening, but that for the next eight days, plaintiff remained in SHU without any mental health treatment.

Plaintiff further alleges that on August 16, 2017, he discussed his discharge plan with Baker.  Baker allegedly noted plaintiff's medication refusal and OMH's desire to pursue an AOT order for plaintiff—even without his consent—upon his release due to his history of noncompliance with treatment and medication.  But Baker allegedly did not inform plaintiff of the importance of medical compliance during his incarceration.  According to plaintiff, no OMH employee provided further clinical contact for plaintiff for at least a week.

Plaintiff claims that on August 21 and 22, 2017, OMH Clinician DiNardo presented mental health testimony at plaintiff's disciplinary hearing before Supervising Offender Rehabilitation Coordinator Horan, which began on August 15, 2017.

On August 22, 2017, OMH allegedly conducted a "14-day Special Housing Unit review" but did not recommend DOCCS divert plaintiff out of SHU and into a therapeutic alternative placement, such as a residential mental health treatment unit ("RMHTU"). (AC ¶ 125)

Plaintiff also alleges that on August 22, 2017, Horan found plaintiff guilty of several disciplinary charges. He allegedly sentenced plaintiff to fourteen days of time-served in SHU, as well as sixty days keeplock time, with thirty days suspended and 180 days deferred, despite knowing of plaintiff's serious mental illness, S-designation, prior suicidal ideation, and eligibility for a diversion from segregated confinement under the SHU Exclusion Law. In the disposition, Horan allegedly noted that plaintiff's "mental health issues were taken into consideration . . . sanctions are not excessive and due to mental health issues have been (partially) suspended." (AC ¶ 128).

Plaintiff claims that on August 23, 2017, Superintendent Morton reviewed plaintiff's disciplinary sentence because mental health was at issue during the hearing process and the confinement sanction exceeded thirty days—that is, a total of forty-four days. Morton declined to amend plaintiff's penalty.

According to plaintiff, at his initial placement into and subsequent various junctures during his segregated confinement,[5] a determination of whether or not "exceptional circumstances" existed to maintain him in segregated confinement should have been conducted and documented, but was not. See SHU Exclusion Law § 137(6)(d)(i)–(ii). He also maintains that such exceptional circumstances did not exist, meaning he should have been moved out of segregated confinement and into an RMHTU. Id. Plaintiff also contends that during his segregated confinement, he was not "offered a heightened level of care, involving a minimum of

---

[5]       "'Segregated confinement' means the disciplinary confinement of an inmate in a special housing unit or in a separate keeplock housing unit." Correction Law § 2(23).

two hours each day, five days a week, of out-of-cell therapeutic treatment and programming," as should have been offered to a seriously mentally ill inmate who was not removed from segregated confinement.  See id. § 137(6)(d)(iii).

III.   Continued Medication Refusal and Discharge from Downstate

Plaintiff alleges that on August 24, 2017, Kulick again documented plaintiff's continued refusal to take his psychiatric medication.  Kulick allegedly set a follow-up appointment for four weeks later, at which time plaintiff would be out of prison.

Plaintiff further alleges that on August 25, 2017, OMH Psychiatrist Reynolds explained to plaintiff that AOT's goals were to reduce his symptoms, likelihood of hospitalization, and risk of incarceration.  Reynolds allegedly documented that plaintiff's medication noncompliance increased his suicide risk and plaintiff had been refusing to take his medication since June 30, 2017, but he took no action about plaintiff's medication refusal.  That same day, Baker allegedly confirmed the AOT application had been sent to the New York Attorney General ("NYAG"), but allowed plaintiff to remain in segregated confinement.

According to plaintiff, from August 25 until his discharge on September 5, 2017, he had no contact with mental health staff and was afforded no mental health treatment.

Plaintiff alleges that on September 5, 2017, defendants released him directly from segregated confinement into the community, "untreated, unmedicated, and in active psychosis." (AC ¶ 149).  The following afternoon, plaintiff allegedly repeatedly stabbed his mother while experiencing active psychosis.

**DISCUSSION**

I.      Standard of Review

In deciding a Rule 12(b)(6) motion, the Court evaluates the sufficiency of the operative

complaint under the "two-pronged approach" articulated by the Supreme Court in Ashcroft v.

Iqbal, 556 U.S. 662, 679 (2009).[6]  First, plaintiff's legal conclusions and "[t]hreadbare recitals of

the elements of a cause of action, supported by mere conclusory statements," are not entitled to

the assumption of truth and are thus not sufficient to withstand a motion to dismiss.  Id. at 678;

Hayden v. Paterson, 594 F.3d 150, 161 (2d Cir. 2010).  Second, "[w]hen there are well-pleaded

factual allegations, a court should assume their veracity and then determine whether they

plausibly give rise to an entitlement to relief."  Ashcroft v. Iqbal, 556 U.S. at 679.

To survive a Rule 12(b)(6) motion, the allegations in the complaint must meet a standard

of "plausibility."  Ashcroft v. Iqbal, 556 U.S. at 678; Bell Atl. Corp. v. Twombly, 550 U.S. 544,

564 (2007).  A claim is facially plausible "when the plaintiff pleads factual content that allows

the court to draw the reasonable inference that the defendant is liable for the misconduct

alleged."  Ashcroft v. Iqbal, 556 U.S. at 678.  "The plausibility standard is not akin to a

'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted

unlawfully."  Id. (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 556).

II.     Eighth Amendment Deliberate Indifference to Medical Needs Claim

The individual defendants argue plaintiff fails plausibly to state a claim for deliberate

indifference to his serious medical needs.

The Court agrees with respect to Sullivan and DiNardo, but disagrees as to the other

individual defendants.

---

[6]      Unless otherwise indicated, case quotations omit all internal citations, quotation marks,
footnotes, and alterations.

A.      <u>Legal Standard</u>

To state a claim for constitutionally inadequate medical care, a plaintiff "must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." <u>Estelle v. Gamble</u>, 429 U.S. 97, 106 (1976).  This test has an objective prong and a <u>mens</u> <u>rea</u> prong:  a plaintiff must plausibly allege (i) a "sufficiently serious" inadequacy of medical care, and (ii) that the officials in question acted with a "sufficiently culpable state of mind." <u>Salahuddin v. Goord</u>, 467 F.3d 263, 279–80 (2d Cir. 2006).

The objective prong has two subparts.  First, a plaintiff must adequately plead he "was actually deprived of adequate medical care."  <u>Salahuddin v. Goord</u>, 467 F.3d at 279.  Because "the prison official's duty is only to provide reasonable care," prison officials violate the Eighth Amendment only if they fail "'to take reasonable measures' in response to a medical condition." <u>Id</u>. at 279–80 (quoting <u>Farmer v. Brennan</u>, 511 U.S. 825, 847 (1994)).  Second, a plaintiff must plausibly allege "the inadequacy in medical care is sufficiently serious."  <u>Id</u>. at 280.  Courts assess this by examining "how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner."  <u>Id</u>.  If the allegedly offending conduct "is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is sufficiently serious."  <u>Id</u>.  But if the offending conduct is the "medical treatment given, the seriousness inquiry is narrower."  <u>Id</u>.  Then, courts look to the "alleged inadequate treatment, not the underlying condition alone," and consider "the effectiveness of the treatment the prisoner received, and the harm that resulted from the alleged shortfalls."  <u>Sanders v. City of New York</u>, 2018 WL 3117508, at *8 (S.D.N.Y. June 25, 2018).

"Depending on their severity, psychiatric or psychological conditions can present serious medical needs in light of our contemporary standards."  <u>Charles v. Orange County</u>, 925 F.3d 73,

86 (2d Cir. 2019) (citing Cuoco v. Moritsugu, 222 F.3d 99, 106 (2d Cir. 2000)).  "The serious

medical needs standard contemplates a condition of urgency such as one that may produce death,

degeneration, or extreme pain."  See id. (citing Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir.

1996)).  "In most cases, the actual medical consequences that flow from the denial of care are

highly relevant in determining whether the denial of treatment subjected the detainee to a

significant risk of serious harm."  Id. (citing Smith v. Carpenter, 316 F.3d 178, 187 (2d Cir.

2003)).

 In the context of medical indifference claims, the mens rea prong requires the plaintiff

plausibly to allege "the official acted with deliberate indifference to inmate health."  Salahuddin

v. Goord, 467 F.3d at 280.  "This mental state requires that the charged official act or fail to act

while actually aware of a substantial risk that serious inmate harm will result."  Id.; see Allah v.

Kemp, 2010 WL 5860290, at *9 (N.D.N.Y. Nov. 9, 2010) (reasonable jury could conclude from

failure to provide "more extensive mental health assistance" that defendants were deliberately

indifferent to plaintiff's serious medical needs), report and recommendation adopted, 2011 WL

705210 (Feb. 22, 2011).  "[A] complaint that a physician has been negligent in diagnosing or

treating a medical condition does not state a valid claim of medical mistreatment under the

Eighth Amendment."  Estelle v. Gamble, 429 U.S. at 106.  In other words, medical malpractice

does not rise to the level of a constitutional violation unless the malpractice involves culpable

recklessness.  See Chance v. Armstrong, 143 F.3d 698, 703 (2d Cir. 1998).

 B. Personal Involvement

 To adequately state a Section 1983 claim, "a plaintiff must plead that each Government-

official defendant, through the official's own individual actions, has violated the Constitution."

Tangreti v. Bachmann, 983 F.3d 609, 616 (2d Cir. 2020) (quoting Ashcroft v. Iqbal, 556 U.S. at

676).  Indeed, "a plaintiff must plead and prove the elements of the underlying constitutional

violation directly against the official without relying on a special test for supervisory liability."

Id. at 621.  A defendant may not be held liable under Section 1983 solely because that defendant

employs or supervises a person who violated the plaintiff's rights.  See Ashcroft v. Iqbal, 556

U.S. at 676 ("Government officials may not be held liable for the unconstitutional conduct of

their subordinates under a theory of respondeat superior.").

    C.    Analysis

        1.    Objective Prong

As to the first subpart of the objective prong, plaintiff adequately pleads he was actually

deprived of adequate medical care.  He alleges the following inadequacies in medical care,

despite his S-1 designation, psychiatric treatment history before arriving at Downstate, and

recommendation for an AOT:  (i) from June 24 to June 30, 2017, he had no contact with OMH

staff in the Forensic Diagnostic Unit; (ii) after June 30, he did not have a follow-up evaluation

again until July 19, 2017, when the treatment plan Kulick and Qayyum prepared concluded he

did not need psychotropic medication despite plaintiff's self-reporting of his mental health issues

and his S-designation; (iii) he was not again seen until August 3, 2017; (iv) he was not provided

medication education or counseling when he repeatedly refused to take his psychotropic

medication; and (v) he spent numerous periods of several days at a time in segregated

confinement—where he was especially susceptible to having his existing mental illness

exacerbated or a reoccurrence of psychiatric symptoms provoked—without any mental health

treatment.

Turning to the second subpart, plaintiff plausibly pleads that the inadequacy in medical

care was sufficiently serious.  First, he has plausibly alleged a sufficiently serious medical

condition, that is, he was diagnosed with schizoaffective disorder, bipolar type, and there were periods he did not receive any treatment.  Second, he has plausibly alleged that, during the periods he did receive treatment, the treatment was ineffective and serious harm resulted from those shortfalls.  Namely, DOCCS and OMH officials failed to comply with state statutes that govern treatment of mentally ill incarcerated individuals, and those failures led to plaintiff's altercation with C.O. Kessler and subsequent attack on his mother.

In addition, the Court is not persuaded by defendants' argument that plaintiff merely disagreed with his treatment.  See Chance v. Armstrong, 143 F.3d at 703 ("[M]ere disagreement over the proper treatment does not create a constitutional claim.  So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation.").  The above factual allegations, especially that plaintiff maintains he was offered no mental health treatment for several days-long periods of time nor formally evaluated in compliance with NYCRR § 527.8 make clear this is a not a case about "mere disagreement" with treatment, but one of inadequate treatment.

2.    Mens Rea Prong

Because plaintiff sufficiently pleads the objective prong, the Court turns to the issue of whether plaintiff has plausibly pleaded each individual defendant had the requisite mens rea.  The Court concludes plaintiff has plausibly pleaded that Annucci, Morton, Lahey, Qayyum, Horan, Kulick, Reynolds, and Baker each acted or failed to act while aware of a substantial risk that serious inmate harm would result.  However, plaintiff fails plausibly to plead defendants Sullivan or DiNardo had the requisite mens rea.

a.      DOCCS Acting Commissioner Annucci and Downstate
        Superintendent Morton

Plaintiff alleges that while plaintiff was in SHU, Superintendent Morton made a weekly

report to Annucci about plaintiff's mental health condition and relayed "recommendations about

specific health care services deemed necessary while [plaintiff] was in the SHU." (AC ¶ 24).

Plaintiff also alleges Morton and Annucci took no action to divert plaintiff to an RMHTU as

required by the SHU Exclusion Law.

Moreover, with respect to Morton, plaintiff also alleges that although as an inmate with

an S-designation, he was required to have a confidential mental health interview during his first

week in SHU, Morton did not arrange one. Plaintiff also claims Morton was part of the joint

case management committee ("JCMC") required to evaluate whether exceptional circumstances

under the SHU Exclusion Law existed before plaintiff could be placed in SHU but that no

evaluation was conducted, either at his initial placement in, or at various other times during, his

segregated confinement. Morton also allegedly affirmed plaintiff's segregated confinement

placement after the disciplinary hearing, despite knowing of plaintiff's mental health diagnosis.

Further, although defendants argue Annucci and Morton were not permitted to second-

guess the decisions of a mental health provider, they do not point to any particular decision of a

medical health provider upon which they relied.

b.      OMH Chief Lahey

Plaintiff alleges Lahey examined him several times, diagnosing plaintiff with

schizoaffective disorder, bipolar type, and giving him an S-designation, and, on June 30, 2017,

noting plaintiff was hearing voices, Zyprexa was not helping, and he was not complying with his

medication. Plaintiff also alleges Lahey did not give him any counseling regarding medication

compliance. And although as the Downstate OMH Unit Chief, Lahey allegedly "exercised

14

ultimate authority over administrative, clinical, and mental health treatment" (AC ¶ 27) at Downstate and was "charged with providing mental health treatment" (id. ¶ 76) on the Forensic Diagnostic Unit, plaintiff alleges there were periods of time when he did not receive any mental health treatment.  Finally, plaintiff alleges Leahy was part of the JCMC charged with determining whether exceptional circumstances warranted plaintiff's maintenance in segregated confinement, but that he did not make such a determination.

### c.   Downstate Psychiatrist Qayyum

Plaintiff alleges Qayyum helped prepare plaintiff's treatment plan.  The plan allegedly stated that although plaintiff "found that his mood disturbances were interfering with his functioning, he did not need psychotropic medication," in contradiction to plaintiff's self-report that his medication effectively treated his mental health symptoms.  (AC ¶ 88).  According to plaintiff, this incorrect conclusion that he did not need medication led to defendants' failure to treat plaintiff's mental illness for the remainder of plaintiff's incarceration.  Qayyum also allegedly consulted regarding plaintiff's placement in segregated confinement and later failed to examine plaintiff while he was in SHU.

### d.   Downstate Supervising Offender Rehabilitation Coordinator Horan

Plaintiff's claim with regard to Horan is a closer call.  When Horan sentenced plaintiff to fourteen days of time-served in SHU, as well as sixty days keeplock time, with thirty days suspended and 180 days deferred, he allegedly noted "sanctions are not excessive and due to mental health issues have been (partially) suspended."  (AC ¶ 128).  However, because plaintiff also alleges Horan knew of his S-designation and mental health history, plaintiff plausibly pleads Horan's decision to place plaintiff in keeplock disregarded a substantial risk of harm.

e.    OMH Psychology Assistant Kulick

Plaintiff alleges that although Kulick was aware of plaintiff's mental illness, medication refusal, and inconsistent engagement in treatment—and indeed, provisionally issued plaintiff an S-designation, confirmed his prescription of Zyprexa, and noted medication helped control his symptoms—she did not follow up on plaintiff's medication non-compliance and instead reported in his treatment plan that plaintiff did not need psychotropic medication.  According to plaintiff, this incorrect conclusion that he did not need medication led to defendants' failure to treat plaintiff's mental illness for the remainder of plaintiff's incarceration.

f.    OMH Psychiatrist Reynolds

Plaintiff alleges Reynolds was aware of plaintiff's mental health issues, medication noncompliance, and discussed plaintiff's needs for AOT, which is offered only to people with a history of mental health treatment noncompliance resulting in hospitalization, incarceration, or committing serious acts or threats of violence to self or others.  Plaintiff also alleges Reynolds did not take action to address plaintiff's medication refusal.

g.    OMH Social Worker Baker

Plaintiff alleges that even after Baker provided him with discharge planning—offered to inmates with a serious enough mental health condition that would pose a risk of harm upon release from custody—including recommendation of an AOT, Baker did not provide him any mental health treatment while in segregated confinement, even while noting plaintiff's medication refusal.

h.     OMH Commissioner Sullivan and OMH Clinician DiNardo

By contrast to the allegations against the above defendants, plaintiff does not plausibly plead Sullivan or DiNardo acted or failed to act while aware of a substantial risk that serious inmate harm would result.

Although plaintiff alleges Sullivan was responsible for OMH's provision of services to mentally ill incarcerated people, the AC contains no allegation that she personally knew about plaintiff, his mental illness, or his incarceration in segregated confinement.

And with respect to DiNardo, plaintiff merely alleges she presented confidential mental health testimony at plaintiff's disciplinary hearing, but offers no allegation suggesting she acted or failed to act with deliberate indifference to inmate health.

In light of the foregoing, plaintiff's deliberate indifference to serious medical needs claim against Sullivan and DiNardo must be dismissed.  The deliberate indifference to serious medical needs claim may proceed against the other individual defendants.

III.     Eighth Amendment Conditions of Confinement Claim

Defendants also argue plaintiff has not plausibly pleaded an Eighth Amendment conditions of confinement claim against any individual defendant respecting plaintiff's initial placement and continued detention in segregated confinement notwithstanding his mental illness.

As with plaintiff's deliberate indifference to serious medical needs claim, the Court agrees with respect to Sullivan and DiNardo, but not the other individual defendants.

A.     Legal Standard

To establish an Eighth Amendment conditions of confinement claim, an inmate must satisfy an objective prong and a mens rea prong.  Namely, an inmate must show (i) "a deprivation that is objectively, sufficiently serious that he was denied the minimal civilized

measure of life's necessities," and (ii) "a sufficiently culpable state of mind on the part of the

defendant official, such as deliberate indifference to inmate health or safety." Gaston v.

Coughlin, 249 F.3d 156, 164 (2d Cir. 2001).

To plead plausibly the objective element, "the inmate must show that the conditions,

either alone or in combination, pose an unreasonable risk of serious damage to his health."

Walker v. Schult, 717 F.3d 119, 125 (2d Cir. 2013).  "Thus, prison officials violate the

Constitution when they deprive an inmate of his 'basic human needs' such as food, clothing,

medical care, and safe and sanitary living conditions."  Id.  As noted above, "psychiatric or

psychological conditions can present serious medical needs in light of our contemporary

standards." Charles v. Orange County, 925 F.3d at 86.  "[I]f the particular conditions of

segregation being challenged are such that they inflict a serious mental illness, greatly exacerbate

mental illness, or deprive inmates of their sanity, then defendants have deprived inmates of a

basic necessity of human existence." Madrid v. Gomez, 889 F. Supp. 1146, 1264 (N.D. Cal.

1995).

To plead plausibly the mens rea prong, the plaintiff must allege "the defendant acted with

more than mere negligence."  Walker v. Schult, 717 F.3d at 125 (quoting Farmer v. Brennan, 511

U.S. at 835).  "To constitute deliberate indifference, the prison official must know of, and

disregard, an excessive risk to inmate health or safety."  Id.  "Evidence that a risk was obvious or

otherwise must have been known to a defendant may be sufficient for a fact finder to conclude

that the defendant was actually aware of the risk."  Id.

B.    Analysis

    1.    Objective Prong

Plaintiff has plausibly pleaded the objective prong.  First, although placing an inmate in segregated confinement is not a <u>per se</u> violation of one's constitutional rights, given plaintiff's allegations that his mental illness issues were well-documented and known by various defendants who took part in his placement and maintenance in segregated confinement, plaintiff has sufficiently pleaded his segregated confinement posed an unreasonable risk of serious danger to his health.  <u>See</u> <u>Madrid v. Gomez</u>, 889 F. Supp. at 1265 ("[P]lacing [mentally ill inmates] in the SHU is the mental equivalent of putting an asthmatic in a place with little air to breathe.").  Second, plaintiff plausibly alleges defendants' failure to assess whether exceptional circumstances existed pursuant to the SHU Exclusion Law was a deprivation of his basic human need of medical care.  Finally, plaintiff plausibly alleges his placement in segregated confinement without medication for almost a month exacerbated his mental illness, such that the day after his discharge from prison, plaintiff stabbed his mother while experiencing active psychosis.

    2.    Mens Rea Prong

Because plaintiff has adequately pleaded the objective prong, the Court turns to the issue of whether plaintiff has plausibly pleaded each defendant knew of and disregarded an excessive risk to plaintiff's health and safety, and concludes he did so with regard to defendants Annucci, Morton, Lahey, Qayyum, Kulick, Reynolds, and Baker.  However, he has not adequately pleaded the requisite <u>mens rea</u> with respect to defendants Sullivan or DiNardo.

a.      DOCCS Acting Commissioner Annucci, Downstate
Superintendent Morton, and Supervising Offender Rehabilitation
Coordinator Horan

For the same reasons plaintiff plausibly alleged the <u>mens rea</u> prong of an Eighth

Amendment deliberate indifference to serious medical needs claim with respect to Annucci and

Morton, <u>see supra</u> Part II.C.2.a, and Horan, <u>see supra</u> Part II.C.2.d, plaintiff also adequately

alleges the <u>mens rea</u> prong regarding Annucci, Morton, and Horan with respect to plaintiff's

Eighth Amendment conditions of confinement claim.

b.      OMH Chief Lahey

Plaintiff alleges Lahey knew of plaintiff's mental illness, and indeed specifically

diagnosed plaintiff with schizoaffective disorder, bipolar type, and gave plaintiff an S-

designation.  In addition, as a member of the JCMC, Lahey was allegedly required to evaluate

whether exceptional circumstances existed both before plaintiff could be placed in SHU and at

various other times during his segregated confinement, but that he did not.  Plaintiff also alleges

that Lahey failed to conduct weekly mental health rounds in SHU.

c.      Downstate Psychiatrist Qayyum and OMH Psychology Assistant
Kulick

Plaintiff alleges both Qayyum and Kulick knew of plaintiff's mental health issues and

medication noncompliance.  He also alleges both were "consulted" on August 8, 2017, regarding

plaintiff's placement in SHU (AC ¶ 118) and that they were required to—but did not—provide a

"heightened level of care," "involving a minimum of two hours each day, five days a week, of

out-of-cell therapeutic treatment and programming," while plaintiff was in segregated

confinement.  SHU Exclusion Law § 137(6)(d)(iii); (AC ¶ 137).  Plaintiff also alleges Kulick

took no action when plaintiff continued to refuse his medication while in segregated

confinement.

d.      OMH Psychiatrist Reynolds

Plaintiff alleges Reynolds knew about his mental illness and was consulted regarding plaintiff's placement in SHU on August 8, 2017.  While plaintiff was in segregated confinement, Reynolds discussed with plaintiff the AOT, a program authorizing court-ordered treatment in the community for people with severe mental illness at risk of relapse or deterioration absent voluntary compliance with prescribed treatment, and noted plaintiff's medication refusal. However, Reynolds allegedly did not treat plaintiff's mental illness in any fashion.

e.      OMH Social Worker Baker

Plaintiff alleges that on August 3, 2017, Baker conducted mental health discharge planning for plaintiff and recommended plaintiff continue outpatient treatment and medication, as well as enrollment in AOT.  Plaintiff also alleges Baker was consulted regarding plaintiff's placement in SHU on August 8, 2017.  In addition, on August 16, 2017, at which point plaintiff was in SHU, Baker allegedly noted plaintiff's medication refusal and that OMH would pursue AOT even without plaintiff's consent, but did not discuss with plaintiff the importance of medication compliance.  Finally, on August 25, 2017, Baker allegedly mailed plaintiff's AOT application to the NYAG.  However, plaintiff alleges Baker did not take action to treat him or remove him from segregated confinement.

f.      OMH Commissioner Sullivan and OMH Clinician DiNardo

For the same reasons plaintiff failed adequately to allege the mens rea prong of an Eighth Amendment deliberate indifference to serious medical needs claim with respect to Sullivan and DiNardo, see supra Part II.C.2.h, plaintiff also fails to allege the mens rea prong as to Sullivan and DiNardo with respect to the conditions of confinement claim.

Accordingly, the Eighth Amendment claim stemming from plaintiff's confinement in segregated confinement must be dismissed against Sullivan and DiNardo but may proceed against the other individual defendants.

IV.    Qualified Immunity

The individual defendants argue they are entitled to qualified immunity with regard to plaintiff's Eighth Amendment claims.

The Court disagrees.

Qualified immunity shields government officials whose conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  The scope of qualified immunity is broad, and it protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986).  "Defendants bear the burden of establishing qualified immunity." Garcia v. Does, 779 F.3d 84, 92 (2d Cir. 2015).

"The issues on qualified immunity are:  (1) whether plaintiff has shown facts making out violation of a constitutional right; (2) if so, whether that right was clearly established; and (3) even if the right was clearly established, whether it was objectively reasonable for the officer to believe the conduct at issue was lawful." Gonzalez v. City of Schenectady, 728 F.3d 149, 154 (2d Cir. 2013).

"[A] defendant asserting a qualified immunity defense on a motion to dismiss faces a formidable hurdle and is usually not successful." Barnett v. Mount Vernon Police Dep't, 523 F. App'x 811, 813 (2d Cir. 2013) (summary order).  "The defense will succeed only where entitlement to qualified immunity can be established based solely on the facts appearing on the

face of the complaint." Id.  "For these reasons, a motion to dismiss is a mismatch for immunity and almost always a bad ground of dismissal."  Id.

Here, plaintiff plausibly states a claim for violation of his clearly established constitutional right to be provided constitutionally adequate medical care and to be free from unconstitutional conditions of confinement.  Moreover, it is not clear from the face of the complaint that Annucci, Morton, Lahey, Qayyum, Horan, Kulick, Reynolds, and Baker's conduct was objectively reasonable under the circumstances.  Accordingly, a grant of qualified immunity for these defendants is not warranted at this time.  If appropriate, the qualified immunity argument may be raised at summary judgment.

V.        ADA and Rehabilitation Act Claims

Defendants argue plaintiff fails to state a claim against Annucci, Sullivan, DOCCS, and OMH for violation of the ADA and Rehabilitation Act.

The Court agrees.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  See 42 U.S.C. § 12132.  Similarly, Section 504 of the Rehabilitation Act provides that no qualified individual with a disability "shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."  29 U.S.C. § 794(a).  Although the ADA and Rehabilitation Act differ in some respects, unless one of the "subtle distinctions [between the statutes] is pertinent to a particular case," courts treat the statutes identically.  See Henrietta D. v. Bloomberg, 331 F.3d 261, 272 (2d Cir. 2003).  Because no

distinction between the ADA and the Rehabilitation Act is relevant here, the Court considers the claims brought pursuant to those statutes together.

To plead a violation under either statute, a plaintiff must plausibly allege (i) he is a "qualified individual" with a disability; (ii) defendants are subject to the ADA; and (iii) the plaintiff was denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or was otherwise discriminated against by defendants on the basis of his disability.  Henrietta D. v. Bloomberg, 331 F.3d at 272.  Importantly, neither the ADA nor the Rehabilitation Act "applies to claims regarding the quality of mental health services, nor do the statutes create a remedy for medical malpractice."  Maccharulo v. N.Y.S. Dep't of Corr. Servs., 2010 WL 2899751, at *2 (S.D.N.Y. July 21, 2010).

ADA and Rehabilitation Act claims may be based on either a theory of disparate treatment or failure to make reasonable accommodations.  Henrietta D. v. Bloomberg, 331 F.3d at 275–77.

To state a disparate treatment claim, plaintiff must allege services provided to non-disabled individuals were "denied to disabled individuals because of their disability." Maccharulo v. N.Y.S. Dep't of Corr. Servs., 2010 WL 2899751, at *3.  "Therefore, when there is no allegation of 'disparate treatment' between disabled and non-disabled individuals, the plaintiff has not stated a claim under the ADA or the Rehabilitation Act."  Id.

"[A] claim of discrimination based on a failure reasonably to accommodate is distinct from a claim of discrimination based on disparate impact."  Henrietta D. v. Bloomberg, 331 F.3d at 276–77.  "Quite simply, the demonstration that a disability makes it difficult for a plaintiff to access benefits that are available to both those with and without disabilities is sufficient to

sustain a claim for a reasonable accommodation." Id. at 277.  Still, plaintiff must demonstrate a denial of benefits occurred "because of" the disability." Id.

Here, even assuming plaintiff is a "qualified individual" with a disability and defendants are subject to the ADA and Rehabilitation Act, plaintiff fails plausibly to plead he was denied the opportunity to participate in or benefit from DOCCS's and OMH's services, programs, or activities, or was otherwise discriminated against by DOCCS or OMH by reason of his disability. Plaintiff complains his placement in SHU constitutes disparate treatment because DOCCS and OMH placed him there as punishment for manifestation of his mental illness.  However, plaintiff does not allege he was treated differently from non-disabled, disruptive inmates.  Thus, plaintiff's disparate treatment theory fails.  See Maccharulo v. N.Y.S. Dep't of Corr. Servs., 2010 WL 2899751, at *4.

Plaintiff's failure to accommodate theory also fails.  Plaintiff argues the failure to be diverted from SHU into a therapeutic alternative placement such as an RMHTU was a failure to accommodate his disability.  However, this allegation challenges the adequacy of the treatment he received and cannot form the basis of an ADA or Rehabilitation Act claim.  Cf. Maccharulo v. N.Y.S. Dep't of Corr. Servs., 2010 WL 2899751, at *4 (allegations regarding "disciplinary relegation to the SHU challenge the adequacy of the mental health treatment that Decedent received but do not allege the type of denial of services that is required to state a claim under the ADA or the Rehabilitation Act").  Moreover, plaintiff fails to allege facts giving rise to an inference that defendants did not divert him to a therapeutic alternative placement because of his disability.  Indeed, plaintiff merely alleges in conclusory fashion that defendants discriminated against him "on the basis of his disability."  (AC ¶¶ 204, 205, 215, 216).  Such a threadbare

recital of a cause of action is insufficient to withstand a motion to dismiss. Ashcroft v. Iqbal, 556 U.S. at 678.

Accordingly, plaintiff's ADA and Rehabilitation Act claims must be dismissed.[7]

VI.     SHU Exclusion Law Claim

Defendants argue plaintiff's claim against OMH, Lahey, and Kulick for violation of the SHU Exclusion Law should be dismissed because that statute does not include an implied private right of action, and that even if a private right of action were implied, the statute of limitations has run.[8]

The Court disagrees with respect to Lahey and Kulick, but not OMH.

A.     Implied Private Right of Action

"Where, as here, there is no express legislative authorization, whether the violation of a statute gives rise to an independent private cause of action is a matter for the courts." Henry v. Isaac, 214 A.D.2d 188, 191 (2d Dep't 1995). New York courts consider the following factors to determine whether a private right of action may be implied under a statute: "(1) whether the plaintiff is one of the class for whose particular benefit the statute was enacted; (2) whether recognition of a private right of action would promote the legislative purpose; and (3) whether creation of such a right would be consistent with the legislative scheme." Sheehy v. Big Flats Cmty. Day, Inc., 73 N.Y.2d 629, 633 (1989). "[R]egardless of its consistency with the basic

---

[7]     Even if plaintiff had adequately alleged these claims, they could not proceed against Annucci or Sullivan. See Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn, 280 F.3d 98, 107 (2d Cir. 2001) ("[N]either Title II of the ADA nor § 504 of the Rehabilitation Act provides for individual capacity suits against state officials.").

[8]     Although plaintiff asserts this claim against "OMH and OMH Defendants," plaintiff fails to define "OMH Defendants." Accordingly, the Court construes this claim as having been brought only against OMH and the two individual defendants specifically named within the Fifth Claim for Relief—Lahey and Kulick.

legislative goal, a private right of action should not be judicially sanctioned if it is incompatible with the enforcement mechanism chosen by the Legislature or with some other aspect of the over-all statutory scheme." Id. at 634–35.  "The third factor is the most important and typically turns on the legislature's choice to provide one particular enforcement mechanism to the exclusion of others—a choice that should be respected by the courts." Ortiz v. Ciox Health LLC, 2021 WL 5407394, at *3 (N.Y. Nov. 18, 2021) (citing Cruz v. TD Bank, N.A., 22 N.Y.3d 61, 70–71 (2013), and Sheehy v. Big Flats Cmty. Day, Inc., 73 N.Y.2d at 629).

Here, with regard to the first Sheehy factor, as an individual with allegedly serious mental health illness, plaintiff is one of the class for whose benefit the SHU Exclusion Law was enacted.

With respect to the second factor, the recognition of a private right of action would promote the legislative purposes, which were articulated in the legislative findings of the SHU Exclusion Law in 2008:

> 1. The legislature finds that the needs of inmates with serious mental illness should be served by improved access to mental health treatment during incarceration. In particular, inmates with serious mental illness should be offered therapeutic care and treatment in residential mental health settings when doing so will not compromise the safety of inmates or other persons or the security of the facility.  While in exceptional circumstances segregated confinement may sometimes be necessary to maintain such safety and security, even for inmates with serious mental illness, the state should strive to maintain such inmates with serious mental illness in less restrictive settings whenever it can safely do so.
>
> 2. When inmates with serious mental illness are placed in segregated confinement, they should receive a heightened level of care, including out-of-cell therapeutic programming and/or mental health treatment, when consistent with the safety of the inmate and other persons or the security of the facility.  Such inmates with serious mental illness should also undergo periodic reassessments of their mental condition to determine whether diversion from segregated confinement to a less restrictive setting is appropriate.

S.B. 6422, 2007–08 Reg. Sess. (N.Y. 2007) (emphasis added).

As to the third, and most important, <u>Sheehy</u> factor, "there are no indications that the creation of a private right of action is inconsistent with the legislative scheme." <u>Lino v. City of New York</u>, 101 A.D.3d 552, 557 (1st Dep't 2012).  Section 137(6) provides direction to DOCCS and OMH regarding maintenance of mentally ill inmates in segregated confinement, but contains no express remedies allowing an inmate to enforce the statute.

Defendants point to <u>Jones v. State</u>, 171 A.D.3d 1362, 1365 (3d Dep't 2019), <u>appeal dismissed</u>, 33 N.Y.3d 1056 (2019), for the proposition that Section 137(6) does not imclude an implied private right of action.  The Court is not persuaded.  There, an inmate alleged prison staff retaliated against him for filing grievances, denied him protective custody and law library access, and discriminated against him because he was a sex offender.

The Appellate Division affirmed the Court of Claims's grant of a motion to dismiss for lack of subject matter jurisdiction and failure to state a cause of action.  In so doing, the court held that several specific provisions of the Correction Law not at issue in this case, including a different subsection of Section 137—Section 137(5), which prohibits "degrading treatment" of inmates and the infliction of corporal punishment except in certain limited circumstances, but which does <u>not</u> address mentally ill inmates specifically—do not include an implied private right of action.  However, the court did <u>not</u> hold that Section 137 generally did not include an implied private right of action.  Moreover, the court held that "[g]iven that the inmate grievance program exists to address inmates' complaints and allegations of discriminatory treatment, and that judicial review may proceed pursuant to CPLR article 78, we do not find that implying a private right of action here would be consistent with the legislative scheme." <u>Jones v. State</u>, 171 A.D.3d at 1365.

Here, however, the Court is skeptical that inmates such as plaintiff—who have serious

mental illnesses, are confined in segregated confinement, and have been refusing to take their

psychotropic medication—could easily avail themselves of remedies such as the grievance

process or an Article 78 proceeding, even if those were available avenues to enforce Section

137(6).[9]  Accordingly, the Court concludes that Section 137(6) does include a private right of

action consistent with the legislative purposes and scheme.  Cf. Lino v. City of New York, 101

A.D.3d at 557 (holding Criminal Procedure Law §§ 160.50, .55 created private rights of action

because "the legislature did not establish other penalties for violation of the statute or provide

any enforcement mechanism"); Henry v. Isaac, 214 A.D.2d at 193 (recognizing a private right of

action even when the relevant state law created an enforcement mechanism because such private

right of action would "promote the legislative purpose . . . to ultimately ensure that individual

residents [of adult care facilities] are provided with a certain level and quality of care").

The private right of action, however, may only be implied against Lahey and Kulick

because as a state agency, OMH has sovereign immunity.  See Alden v. Maine, 527 U.S. 706,

715–16 (1999); Woods v. Rondout Valley Cent. Sch. Dist. Bd. of Educ., 466 F.3d 232, 236 (2d

Cir. 2006) ("The immunity recognized by the Eleventh Amendment extends beyond the states

themselves to state agents.").

B.    Statute of Limitations

New York law provides for a three-year statute of limitations in "an action to recover

upon a liability, penalty or forfeiture created or imposed by statute."  C.P.L.R. § 214(2).  Plaintiff

---

[9]    Defendants have not identified any remedies plaintiff may have availed himself of to
ensure enforcement of the SHU Exclusion Law or how such remedies, if they existed, are
"incompatible" with an implied private right of action.  See Sheehy v. Big Flats Cmty. Day, Inc.,
73 N.Y.2d at 634–35.

was released from custody from segregated confinement on September 5, 2017.  Accordingly,

plaintiff timely raised this claim when he commenced this action on September 1, 2020.

       C.    <u>Analysis</u>

Finally, plaintiff plausibly alleges Lahey and Kulick violated Section 137(6) by failing to

advocate that plaintiff be diverted from SHU, conduct periodic mental health evaluations while

plaintiff was in segregated confinement, and provide plaintiff a "heightened level of care" in

segregated confinement.  (AC ¶¶ 223-24).

Accordingly, plaintiff's Section 137(6) claim pursuant against Lahey and Kulick may

proceed, but the claim must be dismissed as against OMH.[10]

VII.    <u>Negligent Supervision and Training Claim</u>

Defendants argue the negligent supervision and training claim against OMH and Sullivan

must be dismissed.

The Court agrees.

Plaintiff does not address this argument in his opposition brief.  Thus, plaintiff is deemed

to have abandoned this claim.  <u>See</u> <u>Lipton v. County of Orange</u>, 315 F. Supp. 2d 434, 446

(S.D.N.Y. 2004) ("[A] [c]ourt may, and generally will, deem a claim abandoned when a plaintiff

fails to respond to a defendant's arguments that the claim should be dismissed.").

---

[10]    Inasmuch the parties disagree whether plaintiff faced thirty days or longer in segregated confinement—as required to trigger Section 137(6)—the Court accepts as true at the motion to dismiss stage plaintiff's allegations that he faced segregation of longer than thirty days.

**CONCLUSION**

The motion to dismiss is GRANTED IN PART and DENIED IN PART.  The following claims are dismissed:  (i) Eighth Amendment claims against Sullivan and DiNardo; (ii) ADA and Rehabilitation Act claims; (iii) Section 137(6) claim against OMH; and (iv) negligent supervision and training claim.

The Clerk is instructed to terminate from the docket defendants Ann Marie T. Sullivan, Maura L. DiNardo, New York State Office of Mental Health, and New York State Department of Corrections and Community Supervision.

By January 11, 2022, defendants Annucci, Morton, Lahey, Qayyum, Horan, Kulick, Reynolds, and Baker shall file an answer to the complaint.

By separate Order, the Court will schedule an initial conference.

The Clerk is instructed to terminate the motion.  (Doc. #74).

Dated:  December 21, 2021
      White Plains, NY

                SO ORDERED:

                Vincent L. Briccetti
                United States District Judge