UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
ELVIN SUAREZ,                                          :
                              Plaintiff,               :
                                                       :
           v.                                          :
                                                       :
ANTHONY J. ANNUCCI, Acting                             :
Commissioner, New York State Department of             :
Corrections and Community Supervision, in his          :
individual capacity; ROBERT MORTON,                    :
Superintendent, Downstate Correctional                 :
Facility, in his individual capacity; RYAN             :
LAHEY, Office of Mental Health Unit Chief,             :
Downstate Correctional Facility, in his               :
individual capacity; ABDUL QAYYUM,                     :          **OPINION AND ORDER**
Psychiatrist, Downstate Correctional Facility, in     :
his individual capacity; PETER M. HORAN,              :
Supervising Offender Rehabilitation                    :          20 CV 7133 (VB)
Coordinator, Downstate Correctional Facility, in      :
his individual capacity; SAMANTHA L.                   :
KULICK, Psychology Assistant 3/Supervisor,            :
New York State Office of Mental Health, in her        :
individual capacity; MAURA L. DINARDO,                :
Clinician, New York State Office of Mental            :
Health, in her individual capacity; BRANDON           :
N. REYNOLDS, Psychiatrist, New York State             :
Office of Mental Health, in his individual            :
capacity; CHESNEY J. BAKER, Licensed                  :
Master Social Worker 2/Supervisor, New York           :
State Office of Mental Health, in his individual      :
capacity,                                              :
                              Defendants.               :
-------------------------------------------------------------x

Briccetti, J.:

        Plaintiff Elvin Suarez brings this Section 1983 action against several employees of the

New York State Department of Corrections and Community Supervision ("DOCCS") and mental

health professionals employed by the New York State Office of Mental Health ("OMH").

Plaintiff, who suffers from schizoaffective disorder, bipolar type, alleges defendants violated his

Eighth Amendment rights while he was incarcerated at Downstate Correctional Facility, in

Fishkill, New York ("Downstate"), by failing adequately to educate him about his need for medication, depriving him of appropriate individual mental health therapy, and housing him in segregated confinement.  Plaintiff claims that as a result of defendants' actions, he psychologically decompensated and violently attacked his mother the day after he was released from Downstate.  Plaintiff also brings a state law claim asserting defendants Lahey, Kulick, and DiNardo violated Section 137(6) of the New York Correction Law by not diverting him from the special housing unit ("SHU") notwithstanding his serious mental illness and the potential that he could have served more than thirty days in segregated confinement.

Now pending is defendants' motion for summary judgment.  (Doc. #129).

For the reasons set forth below, the motion is GRANTED.

This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367(a).

## BACKGROUND

The parties have submitted memoranda of law, supporting declarations with exhibits, and statements of undisputed material fact pursuant to Local Civil Rule 56.1.[1]  Together, they reflect the following factual background.[2]

---

[1]     Defendants submitted a Rule 56.1 statement (Doc. #130 ("Def. 56.1 Statement")) with paragraphs numbered 1 through 86.  Plaintiff submitted a Rule 56.1 counterstatement in which he responded to each fact proffered in Defendants' 56.1 Statement (Doc. #157 at 1–23 ("Pl. 56.1 Responses")), and also supplied 276 "supplemental facts" (Doc. #157 at 24–73 ("Pl. 56.1 Statement")).  On reply, defendants responded to each of plaintiff's supplemental facts.  (Doc. #168 ("Def. 56.1 Responses")).

Citations to transcripts refer to the page number at the top right-hand corner of each transcript page.

[2]     Several citations to exhibits to the Declaration of Zachary S. Newman (Doc. #158 (the "Newman Declaration")) in Plaintiff's 56.1 Statement and Plaintiff's 56.1 Responses refer to pages that are not included in the relevant exhibit or to an incorrect document.  For example, paragraph 10 of Plaintiff's 56.1 Responses refers to pages 19 and 20 of Exhibit 31, but Exhibit

I.       Mental Health Treatment at Downstate

Plaintiff was incarcerated at Downstate from June 22 to September 5, 2017.  At that time,

Downstate was a "reception and classification center," meaning it housed new inmates before

they were transferred to other facilities for permanent confinement.  (Pl. 56.1 Statement ¶ 31).

OMH categorizes correctional facilities based on the level of mental health services and

staffing available.  Downstate was a "Level 1 Facility," meaning it provided the highest level of

mental health services and staffing.  (Def. 56.1 Statement ¶ 6).  Although Level 1 facilities can

vary, they typically have a staff of clinicians, nurses, and psychiatrists on site to support inmates

with mental illness, as well as an OMH satellite mental health crisis unit for intensive treatment.

Downstate's satellite unit, the Forensic Diagnostic Unit ("FDU"), "provided

observation[] cells for individuals in acute psychiatric crisis either through self-injury, suicidal

---

31 does not contain pages 19 or 20.  (See Doc. #158-31).  Paragraph 10 also cites to page 47 of
Exhibit 36, but page 47 is likewise absent from Exhibit 36.  (See Doc. #158-36).

Similarly, paragraphs 203 and 204 in Plaintiff's 56.1 Statement, which concern plaintiff's
disciplinary hearing in August 2017, cite to pages Bates-stamped DOCCS Defendants -085 to -
087 of Exhibit 44.  But Exhibit 44 is an OMH policy document concerning procedures for
compiling clinical records.  (Doc. #158-44).  It is also Bates-stamped OMH POLICIES -049 to -
053, suggesting plaintiff intended to cite to a different document.  (See id.).  Notably,
defendants' reply put plaintiff's counsel on notice that at least some of their citations were amiss.
(See, e.g., Def. 56.1 Responses ¶ 175).  However, plaintiff's counsel has not attempted to correct
the inaccurate citations.

Citations to evidence not in the record cannot support a fact in Plaintiff's 56.1 Statement
or dispute a fact properly supported in Defendants' 56.1 Statement.  Holtz v. Rockefeller, 258
F.3d 62, 73–74 (2d Cir. 2001) ("[W]here the cited materials do not support the factual assertions
in the [56.1 statement], the Court is free to disregard the assertion."), abrogated on other grounds
by Gross v. FBL Fin. Servs., Inc., 557 U.S. 167 (2009); Giannullo v. City of New York, 322
F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact . . . set forth in
the moving party's Rule 56.1 statement, that fact will be deemed admitted.").  Accordingly, the
Court has disregarded each unsupported fact in Plaintiff's 56.1 Statement and Plaintiff's 56.1
Responses and deems admitted the corresponding facts properly supported in Defendants' 56.1
Statement and Defendants' 56.1 Responses.

risk, or psychiatric decompensation." (Doc. #152 ("Kemmery Decl.") ¶ 9). In the FDU, inmates were seen each day by a psychiatrist, clinician, and nurse. In 2017, DOCCS also had satellite units at other correctional facilities that provided an even higher level of care than the FDU. These were referred to as Residential Mental Treatment Units ("RMTUs") and Behavioral Health Units ("BHUs," and together with RMTUs, "Special Programs"). In 2017, there were three Special Programs, none of which was located at Downstate.

As a complement to the facility classification system, OMH has a classification system for identifying the mental health treatment needs of individual inmates. Plaintiff was designated Level 1S. "Level 1" means an individual requires the most intensive available mental health care. An "S" designation means an individual has a "serious mental illness," as defined in Section 137(6)(e) of the New York Correction Law. Individuals with an S designation (i) have one of certain specified diagnoses, including schizoaffective disorder; (ii) are actively suicidal or have recently made a serious attempt at suicide; (iii) have a severe personality disorder marked by frequent episodes of psychosis or depression; or (iv) have substantially deteriorated mentally or emotionally while in segregated confinement and are experiencing significant functional impairment, among other criteria. (Def. 56.1 Statement ¶¶ 5, 7).

All individuals classified as needing mental health care are assigned to OMH's caseload and treated by OMH staff. At Downstate, a Level 1S individual would see his psychiatrist and therapist once a month, "whether in general population or the Special Housing Unit," and would "be seen more often if it is clinically needed." (Doc. #166 ("Kemmery Reply Decl.") ¶ 5).

II.   Disciplinary Policies Concerning Inmates with Mental Illness

During the time plaintiff was at Downstate, there were several policies in place concerning discipline of inmates with serious mental illness. If a Level 1S inmate received a

disciplinary sanction of more than thirty days in segregated confinement, Downstate's policy was to automatically divert the individual to a Special Program (instead of to segregated confinement).  At the time, "segregated confinement" meant disciplinary placement in a segregated unit, separate from the general population.[3]  (See Kemmery Decl. ¶ 12).  In contrast, an inmate serving a keeplock sentence remained in general population but was restricted to his cell for 23 hours a day and allowed out only for one hour of exercise daily.  (Doc. #158-51 at 63; Doc. #136 ("Morton Decl.") ¶ 17).

At Downstate, a Joint Case Management Committee ("JCMC") composed of staff from DOCCS and OMH was responsible for reviewing, monitoring, and coordinating the treatment plans of inmates assigned to OMH's caseload that were placed in SHU or keeplock.  The JCMC could not, by itself, modify a disciplinary sanction or the restoration of a privilege, but could make these recommendations to the superintendent (at that time, defendant Morton).[4]

---

[3]    As discussed in more detail below, at the time of plaintiff's incarceration, the New York Correction Law defined "segregated confinement" as placement in either a "special housing unit"—SHU—or "in a separate keeplock housing unit," both of which were "housing units that consist of cells grouped so as to provide separation from the general population."  S. 6422, 2008 N.Y. Sess. Laws ch.1 § 2 (McKinney) (current version at N.Y. Correct. Law § 2(23)).  Presumably for this reason, several documents in the record refer to a form of "long-term keeplock" as "segregated confinement."  (See, e.g., Kemmery Decl. ¶ 12).  However, the only segregated housing unit at Downstate in 2017 was SHU—that is, there were no "separate keeplock" housing units.  Instead, keeplock sentences were served in an inmate's cell within the general population.  Thus, the only form of keeplock confinement at Downstate was not "segregated confinement" under New York law.

[4]    The parties dispute whether the JCMC ever discussed plaintiff's case.  Plaintiff contends it did, but the evidence cited in support does not corroborate his claim.  (See Def. 56.1 Responses ¶¶ 171, 172).  In any event, this dispute is immaterial to whether defendants acted with the requisite mens rea for purposes of plaintiff's Eighth Amendment claim and whether defendants violated the New York Correction Law.  Accordingly, it does not create a genuine triable issue precluding summary judgment.

Any OMH employee could place an incarcerated individual in need of immediate mental health treatment in the FDU regardless of whether the individual was housed in the general population or segregated confinement, and regardless of whether the individual was scheduled for a disciplinary hearing.  (Def. 56.1 Statement ¶ 31; Doc. #140 ("Kulick Decl.") ¶ 20). DOCCS staff could request a consult with OMH if they believed an incarcerated individual needed immediate care.  However, without input from OMH, a DOCCS employee could not unilaterally place an inmate in a Special Program.  DOCCS staff also could not seek an order forcing an inmate to accept medication over his or her objection.  An OMH clinician, however, could seek a court order compelling medication administration over an inmate's objection.

Lastly, immediately upon admission to SHU, a DOCCS employee would "complet[e] a suicide prevention screening guide," to determine "whether an immediate referral to OMH is warranted."  (Morton Decl. ¶ 12).  After being admitted to SHU, the incarcerated individual was seen by OMH staff every day during daily rounds, which involve an OMH clinician talking to the inmate through the window in the door of their cell.  (See Doc. #158-35 at 371).

III.    Plaintiff's Tier III Disciplinary Proceedings

On August 8, 2017, plaintiff told correction officers that he had "a good memory" and would kill the officers after he was released.  (Doc. #158-29 at ECF 7).[5]  The officers brought plaintiff back to his housing unit, at which time plaintiff "turned and kicked at [an officer],

---

[5]      "ECF __" refers to page numbers automatically assigned by the Court's Electronic Filing System.

striking [the officer] in the right knee."  (Id.).  For this conduct, plaintiff received a Tier III misbehavior report, the most serious type of disciplinary infraction.

At Downstate, inmates were housed in SHU pending disciplinary hearings on Tier III charges.  Accordingly, plaintiff was housed in SHU from August 8, the day of his incident, until August 22, the day his disciplinary hearing concluded.  On August 22, 2017, plaintiff was sentenced to time served of fourteen days in SHU and sixty days in keeplock, with thirty of those keeplock days suspended for one hundred and eighty days.

For plaintiff's first seven days in SHU, he was subject to a deprivation order that deprived him of "[a]ll out of cell activity."  (Doc. #158-50 at ECF 4).  For the first seven days a deprivation order is in effect, it is reviewed daily by SHU staff who determine whether to continue the order for another twenty-four hours.  However, after seven days, the superintendent reviews the deprivation order and determines whether to renew it.  (See Doc. #167-5 at 190).  On the eighth day plaintiff's deprivation order was in effect, August 15, 2017, Morton declined to renew it.  (See id.).

IV.   Plaintiff's Release from Incarceration

On September 5, 2017, plaintiff was released from Downstate.  The following night, plaintiff stabbed his mother multiple times with a kitchen knife in the chest, face, and arms.[6]

---

[6]     Plaintiff's interactions with his mother and sister three days before his release, on September 2, 2017, as well as plaintiff's meetings with his parole officer and post-release mental health coordinator following his release on September 5 and 6, 2017, are not discussed in this Opinion and Order because plaintiff does not suggest any defendant was present for or then aware of those interactions, making them irrelevant to the instant motion.  (See Doc. #158-1 at 67; Doc. #158-11 at 27–28; Doc. #158-86 at Defendants 0124, 0126; Doc. #158-2 at Plaintiff-001645; Doc. #158-92 at Defendants 0125).

V.   <u>Individual Actions of Each Defendant</u>

What follows is a description of the specific conduct of each defendant, as relevant to this motion.

A.   <u>Annucci</u>

Annucci was the Acting Commissioner of DOCCS at the time of these events.  In that capacity, he oversaw forty-four correctional facilities, approximately 31,500 incarcerated individuals, and approximately 24,000 parolees.  He did not monitor the mental health treatment received by particular individuals, and he did not receive reports regarding plaintiff's mental health treatment.

B.   <u>Morton</u>

Morton, as superintendent, was responsible "for the supervision and management of Downstate."  (Pl. 56.1 Statement ¶ 62).  Morton is not a mental health professional.

As relevant here, his duties included reviewing and signing off on recommendations from the JCMC and, once weekly, visiting SHU.  During SHU visits, Morton would interact with inmates to check on their well-being and ensure compliance with applicable policies and procedures.  (Pl. 56.1 Statement ¶¶ 71, 72).  For example, Morton would "[e]nsure inmates held in SHU were supposed to be there," or "review an inmate's folder to make sure the required documentation was present."  (<u>Id</u>. ¶ 73).  It is unclear whether Morton interacted with plaintiff during these rounds.

Morton was also authorized to renew deprivation orders after seven days.  He declined to renew plaintiff's deprivation order.  (Doc. #158-50).

On August 21, 2017, Morton submitted a petition to New York Supreme Court, Dutchess County, seeking an Assisted Outpatient Treatment ("AOT") order for plaintiff.  An AOT order

typically applies for six months to one year and requires a newly released person to "comply with their outpatient treatment, including attending appointments and taking medication." (Doc. #149 ("Reynolds Decl.") ¶ 9. An AOT order is not equivalent to a court order for medication over objection; instead, an AOT order aims to provide a released person who has "struggled with adhering to mental health treatments in the past" and is "at some risk of decompensation or harm" with "enhanced monitoring and support" using the "least restrictive method." (Id. ¶¶ 7, 9, 20).

In the petition for an AOT order, Morton stated plaintiff had a "significant history of mental health problems" and "non-compliance with treatment." (Doc. #158-82 at Defendants 531). He further stated plaintiff would not "change his pattern of treatment non-compliance with resultant psychosis and high risk behaviors without the benefit of court-ordered treatment." (Id.). Plaintiff was ultimately issued a one-year AOT order that required him to take daily medication if clinically prescribed.

Consistent with applicable polices and procedures, Morton was required to review plaintiff's disciplinary hearing packet because (i) plaintiff's mental health was at issue during the hearing and (ii) the "[c]onfinement sanction [was] more than 30 days." (Doc. #135-1 at Defendants 98). On August 23, 2017, Morton signed a form indicating he had reviewed plaintiff's disciplinary disposition and determined plaintiff's "penalty should not be reduced." (Id.). Based on email correspondence between Morton and the DOCCS Acting Assistant Commissioner, dated August 24, 2017, Morton was required to document a "justification" for plaintiff's sanction because it was "OVER the guidelines," for disciplinary sanctions. (Doc. #158-29 at Defendants 463). It is unclear based on the record whether Morton ever did so.

C.    Lahey

As OMH Unit Chief at Downstate, Lahey conducted weekly rounds in SHU, during

which he would try to engage with every person housed there.  (Pl. 56.1 Statement ¶¶ 54, 55).

Lahey would also join a weekly executive meeting with the DOCCS superintendent, Morton, and

deputy superintendents to report on all inmates on OMH's caseload at Downstate.

Lahey also signed off on plaintiff's Level 1S designation.  (Doc. #147-1 at Defendants

280–281).  Further, Lahey was aware that Kirby Psychiatric Center had indicated Downstate

should encourage plaintiff to comply with his medication because he "will decompensate if non-

compliant."  (Doc. #158-67 at Defendants 636).

D.    Kulick

Kulick,[7] an OMH psychologist, was plaintiff's primary clinician at Downstate from his

admission until his placement in SHU on August 8, 2017.

On June 27, 2017, Kulick conducted a confidential interview of plaintiff as part of his

admission screening at Downstate.  Kulick's notes indicate plaintiff described his mental health

history, including prior hospitalizations and inpatient stays at Kirby Forensic Psychiatric Center.

He also informed Kulick he had previously tried to kill himself by cutting his wrists because he

"was out of it, [and] hearing voices."  (Doc. #147-1 at Defendants 307).  Plaintiff could not recall

when this happened.  Plaintiff also reported "experiencing auditory hallucinations" that told

plaintiff to hurt himself.  (Id.).

Kulick recorded that, during this meeting, plaintiff's "[t]hought processes appear[ed]

logical, and there [was] no evidence of formal thought disorder."  (Doc. #147-1 at Defendants

---

[7]    Although Samantha Kulick's name has changed to Samantha Guth since the events
described in this lawsuit, for clarity, the Court refers to her in this Opinion and Order as Kulick.
(Kulick Decl. ¶ 1).

308).  She further noted plaintiff presented with no "hallucinations, delusions, obsessions, phobias or over-valued ideas" and that plaintiff denied "[p]erceptual disturbances of any kind." (Id.).  Plaintiff reportedly had a neutral mood—which plaintiff described as "good"—and he presented with "fair" insight and judgment.  (Id.).  Kulick also observed plaintiff's speech was "spontaneous, goal-directed and of normal rate, rhythm and volume" with "unimpaired" language skills and that plaintiff "maintain[ed] behavioral control" and appropriate eye contact. (Id.).  Further, she indicated plaintiff was "alert and oriented to time, place, and person."  (Id.).

On the morning of July 19, 2017, Kulick met again with plaintiff.  Plaintiff said his mood had been "good" since his last meeting with Kulick and that "he met with the Psychiatrist for [an] initial evaluation on 6/30/2017, at which time [plaintiff's] medication was discontinued due to [plaintiff's] refusal."  (Doc. #147-1 at Defendants 313).  Kulick noted plaintiff reported "feeling 'fine' without psychotropic medication," denied "experiencing psychiatric symptoms," and seemed "adequate[ly] adjust[ed] to incarceration."  (Id. at Defendants 313).  Like her initial meeting with plaintiff, Kulick noted plaintiff did not present with psychotic symptoms and had normal speech patterns, exhibited fair insight and judgment, and appropriately maintained behavioral control and eye contact.  Plaintiff also "persuasively denied" suicidal or homicidal ideation.  (Id. at Defendants 314).  Kulick noted plaintiff was scheduled for a follow up appointment with his psychiatrist in two weeks, that Kulick would see him again in four weeks, and that plaintiff "was advised on how to access mental health services should he require intervention prior to his next scheduled appointment."  (Id.).

The notes from Kulick's first two encounters with plaintiff do not reflect a discussion of medication education.  However, Kulick attested it is her "normal practice to discuss medication

compliance with every patient during every meeting," and that she "would not always specifically write on a progress note" that she had "discussed medication."  (Kulick Decl. ¶ 7).

On the morning of August 8, 2017, Kulick was "asked to conduct an evaluation of Plaintiff based on a referral from a DOCCS Doctor."  (Kulick Decl. ¶ 15; see also Doc. #158-65 at Defendants 318).  Specifically, plaintiff was taken to the infirmary due to "2 small nicks" on his left hand resulting from his altercation with correction officers.  (Doc. #167-4 at DOCCS Defendants 336).  At the infirmary, plaintiff "knew person, place," but began spitting at staff and was "off by 2 days w/ current date."  (Doc. #158-79).  Accordingly, a doctor recommended that plaintiff be referred to OMH.

Kulick's notes from the encounter, which lasted fifteen minutes, indicate plaintiff "deni[ed] being agitated and appear[ed] calm."  (Doc. #158-65 at Defendants 318).  Plaintiff denied suicidal or homicidal ideation, reported a "neutral" mood," had an affect "within normal range and congruent to mood," and exhibited "fair" insight and judgment.  (Id.).  Kulik noted plaintiff's "[t]hought processes appear[ed] logical" and that he did not suffer from "hallucinations [or] delusions."  (Id.).  His eye contact was reportedly "sporadic."  (Id.).  Kulik noted "[p]atient denies drug use; however, it is suspected that he may be under the influence." (Id.).

    E.    DiNardo

DiNardo was the SHU clinician at Downstate and a member of the JCMC.  She became plaintiff's primary clinician when plaintiff was placed in SHU on August 8, 2017.

That day, DiNardo conducted an initial screening of plaintiff.  He was reportedly alert, friendly, cooperative, and not guarded; did not exhibit depression or anxiety; and did not have suicidal or homicidal thoughts.  He denied experiencing auditory or other hallucinations, was

oriented to time, place, and person, and used appropriate speech patterns. (Doc. #146-1 at Defendants 326–27).

On August 21, 2017, DiNardo provided confidential testimony at plaintiff's Tier III disciplinary hearing. During her testimony, DiNardo reviewed plaintiff's mental health history and diagnosis and noted that, consistent with his diagnosis, plaintiff exhibited symptoms of "mood fluctuation and psychosis." (Doc. #158-74 at 4). She also noted his medication had been "discontinued due to his [medication] noncompliance," but she opined that plaintiff was fit to proceed with the hearing. (Id. at 4–5).

DiNardo further opined that, based on plaintiff's mental health records, plaintiff's behavior towards the correction officers was "related to [plaintiff's] mental health symptoms," and therefore, "mitigating factors were not only present but should be given consideration by DOCCS in disposition of this matter." (Doc. #158-74 at 5). She also stated plaintiff's mental health history "should be taken into consideration by the hearing officer in determining the duration of disciplinary sanction." (Id.). Moreover, it was her view that plaintiff's mental illness made him "not suitable for confinement in disciplinary housing" although there were "no records reflecting his ability to cope with segregated or nonsegregated confinement." (Id. at 4–5). She noted that "[n]o matter the length of the sanction given, Mental Health will continue to monitor the inmate patient closely and make referrals for special programming when applicable." (Id. at 5).

On the following day, August 22, DiNardo again interviewed plaintiff. She noted plaintiff was alert, friendly, and cooperative; was not depressed or anxious; and did not have hallucinations or suicidal or homicidal thoughts. (Doc. #146-1 at Defendants 330–31). He

reportedly had appropriate speech patterns; was oriented to time, person, and place; and "remain[ed] oriented for reunion w/ [his] mother."  (Id. at Defendants 330).

DiNardo attested she also saw plaintiff during daily rounds she conducted in SHU. According to DiNardo, during these interactions, "[s]ome days all [plaintiff] wanted to do was say hi, some days he would engage in conversation," and she "ask[ed] him questions about his family" because she "knew that he had family support."  (Doc. #146 ("DiNardo Decl.") ¶ 12). She attests he "was even-keeled" during these conversations and "did not display any symptoms relating to his mental illness and he did not verbally advise [her] of any concerns."  (Id.).

F.    Qayyum

Qayyum was plaintiff's primary psychiatrist while plaintiff was housed in the general population at Downstate.[8]

Qayyum first saw plaintiff on June 30, 2017, one week after his admission to Downstate. During this meeting, Qayyum discontinued plaintiff's prescription for Zyprexa.[9]  Qayyum's notes indicate plaintiff said he did not need, and wanted to be off, the medication because he "heard voices just 1 time" and doesn't hear them anymore.  (Doc. #151-1 at Defendants 301). Plaintiff was "cooperative" and "coherent" during Qayyum's examination, denied auditory hallucinations or visual hallucinations, and reported his mood and affect were good.  (Id.).  In Qayyum's notes from this visit, he checked a box indicating he provided "medication education"

---

[8]    Qayyum testified plaintiff would have been assigned another psychiatrist while in SHU. (See Doc. #167-2 at 193).

[9]    Zyprexa is the "branded product" for the generic medication Olanzapine.  (Def. 56.1 Statement ¶ 50).  It is an antipsychotic drug used to treat schizophrenia and bipolar disorder. Olanzapine Tablets, Cleveland Clinic, https://my.clevelandclinic.org/health/drugs/18192-olanzapine-tablets (last visited Feb. 22, 2024).

to plaintiff.  (Id. at Defendants 302).  He noted plaintiff would continue individual therapy, and that Qayyum would follow up with plaintiff in two weeks.

Qayyum next saw plaintiff on July 21, 2017.  During this visit, plaintiff stated he was doing fine and denied auditory hallucinations.  Qayyum observed plaintiff was "coherent," but that his mood and affect were "slightly blunged," which means plaintiff "was not animated." (Doc. #151 ("Qayyum Decl.") ¶ 12).  He noted plaintiff's insight and judgment were "fair." (Doc. #151-1 at Defendants 303).  Plaintiff was still "declining meds," but Qayyum again indicated he provided plaintiff "medication education" and that plaintiff would continue individual therapy.  (Id. at Defendants 304).

On August 11, 2017, Qayyum received a copy of plaintiff's discharge summary from Kirby Forensic Psychiatric Center, which was dated March 16, 2017, and which indicated the "[a]ccepting facility" should "encourage medication compliance as [plaintiff] will decompensate if non-compliant."  (Doc. #158-68 at Defendants 636).

Qayyum saw plaintiff a final time on August 24, 2017.  Qayyum's notes indicate plaintiff seemed "coherent" but was "laughing inappropriately."  (Doc. #151-1 at Defendants 305). Plaintiff reportedly denied having auditory or visual hallucinations and had "fair" insight and judgment.  (Id.).  Qayyum again noted plaintiff was "declining meds" but would continue individual therapy, and Qayyum indicated he provided plaintiff with "medication education." (Id. at Defendants 306).

Qayyum attests that he discusses "the risks and benefits of taking medication . . . with each patient during all mental health appointments."  (Qayyum Decl. ¶ 4).

G.    Horan

Horan was a Supervising Offender Rehabilitation Coordinator ("SORC") at Downstate and presided over plaintiff's disciplinary hearing.

At the time of the hearing, Horan knew plaintiff's mental health designation and that plaintiff was being held in SHU while awaiting the hearing.  (See Doc. #167-11 at 57, 160–61). Although DOCCS staff decide where to house an inmate pending a hearing, Horan, as the hearing officer, could "release an inmate from confinement" but "rarely did that."  (Id. at 57). Horan believed that "if OMH felt that an inmate was inappropriately in any place in the facility, they could enact procedures to get that person the proper treatment in the setting that they think would be most appropriate for that person."  (Id. at 112).

Under DOCCS rules, plaintiff's hearing had to commence within seven days of the misbehavior report and the hearing had to be completed within fourteen days unless Horan received an extension.  (Doc. #167-11 at 57–58).  Horan testified during his deposition that a hearing officer could request an extension if he was unavailable due to "sickness, family death, [or] appointments," but that an extension request due to vacation might not be granted.  (Doc. #158-52 at 64–65).  Moreover, according to Horan, typically the disciplinary office would know when a particular hearing officer was unavailable, so they would not assign that officer a hearing during those periods of time.

Horan requested, and was granted, a one-day extension to commence plaintiff's hearing on August 16 because of Horan's unavailability.  (Doc. #135-1 at Defendants 96).  Nonetheless, Plaintiff's disciplinary hearing began on August 15, 2017.  Early in the hearing, plaintiff stated he didn't "know why [he] need[ed] a hearing" and didn't understand the charges against him. (Doc. #158-89 at 2–3).  Plaintiff also asked Horan what OMH was.  (Id. at 3).  Horan informed

plaintiff OMH referred to "Mental Health treatment" and that plaintiff was designated "as having a serious mental illness."  (Id. at 3–4).  Plaintiff disagreed with Horan's statement, and, when asked, plaintiff informed Horan he was not taking any medication.

Horan read the misbehavior report into the record, and plaintiff pleaded guilty to creating a disturbance, assault on staff, and refusing a direct order.  Plaintiff pleaded not guilty to harassment and making threats.  For the disturbance and assault charges, Horan questioned plaintiff about whether he committed the specific actions underlying each charge.

The hearing was adjourned so Horan could receive confidential testimony from DiNardo about plaintiff's mental health outside of plaintiff's presence.  That testimony was provided on August 21, 2017, and is described above.  Before DiNardo began her testimony, Horan remarked that plaintiff did not "seem to be completely free of any signs of mental illness" and that there "seem[ed] to be a little bit of a lack of connection there" when Horan talked to plaintiff.  (Doc. #158-74 at 2).

The hearing resumed the following day, on August 22, 2017.  On the record, Horan explained the hearing was supposed to resume on August 18, but OMH had to reschedule and then Horan was not able to reconvene until August 21.  (Doc. #158-89 at 7; see also Doc. #135-1 at Defendants 97).

Horan found plaintiff guilty of the charges to which he pleaded guilty—creating a disturbance, assault on staff, and refusing direct orders—but not guilty of harassment and making threats.  As punishment, Horan sentenced plaintiff to time served in SHU and sixty days of keeplock, thirty of which were suspended for one hundred and eighty days in consideration of plaintiff's mental health issues.  (Doc. #158-89 at 9; see also Doc. #135-1 at Defendants 89).  By suspending thirty days of the keeplock sentence, Horan attested plaintiff "would never serve

those additional thirty days" if he "remained in custody and was not found guilty of any additional misbehavior."  (Doc. #135 ("Horan Decl.") ¶ 6).

In post-hearing paperwork, Horan indicated he believed plaintiff's serious misconduct "warranted isolation and confinement."  (Doc. #158-29 at Defendants 472).  However, Horan testified during his deposition that because of plaintiff's 1S designation, he "wanted [plaintiff] out of SHU as quickly as possible," i.e., "as soon as the hearing was over."  (Doc. #158-52 at 171).  Horan attested the sentence imposed was "a relatively minor penalty" given the charges. (Id.)  Horan further indicated he had considered plaintiff's mental health in suspending a portion of the keeplock sentence, not sentencing plaintiff to "a loss of phones, packages, or commissary," and not recommending plaintiff lose good time, "which could have extended his release date."  (Horan Decl. ¶ 6).

H.    Reynolds

On August 17, 2017, Reynolds, the OMH Regional Psychiatrist for Pre-Release and Legal Matters, evaluated plaintiff for AOT eligibility.  (Doc. #158-72 at Defendants 324).

Reynolds's notes from the August 17 meeting indicate plaintiff stated he did "not believe he suffers from a mental illness," notwithstanding his diagnosis.  (Doc. #158-72 at Defendants 324).  Plaintiff reportedly "admit[ted] to hearing voices" at an earlier time when he attempted suicide but denied having heard any voices in a long time.  (Id.).  Plaintiff reported his mood as "fine," but Reynolds noted plaintiff's "affect [was] mildly elevated, with frequent and inappropriate smiling and laughter."  (Id.).  Reynolds further observed plaintiff was "alert and oriented to person, place, and time," but that plaintiff's insight was "poor."  (Id.).  Reynolds indicated plaintiff was cooperative and presented linear thought processes, as well as denied suicidal and homicidal ideations or experiencing auditory hallucinations "recently."  (Id.).

Reynolds also noted plaintiff had been refusing medication, and that plaintiff's medication non-compliance increased his risk of suicide.  (Id. at Defendants 324–325).

Reynolds met with plaintiff again on August 25, 2017, for an "AOT examination."[10] During the meeting, Reynolds explained the AOT program and the "[e]lements of the proposed AOT Medication Worksheet."  (Doc. #158-81 at Defendants 331).[11]  At this meeting, plaintiff informed Reynolds his mood was "alright," and Reynolds noted plaintiff's insight remained poor and his "affect remain[ed] mildly elevated, with inappropriate smiling and laughter."  (Id.). However, Reynolds noted plaintiff denied suicidal or homicidal ideations, exhibited linear thought processes and cooperative speech patterns, and told Reynolds he planned to live with his mother upon release and did "not anticipate any major problems."  (Id.).

Reynolds concluded plaintiff qualified for an AOT and submitted an affirmation to the court presiding over the AOT petition.  The affirmation described plaintiff's prior inpatient psychiatric hospital admissions and noted that "[w]hen non-complaint with psychiatric treatment, Patient experiences auditory hallucinations, mood lability, and suicidal ideation.  He also has a history of violence towards self and others."  (Doc. #158-82 at Defendants 535).  Reynolds wrote that, according to plaintiff's health records, he had not been medication compliant prior to his two admissions to Kirby Forensic Psychiatric Center.  Reynolds also noted plaintiff had refused his medication for five weeks prior to assaulting a correction officer at Downstate.

---

[10]     At an AOT examination, Reynolds reviews with an inmate the basis for the AOT, provides basic information on "what AOT is, how it works," and how it will benefit the individual inmate.  (Reynolds Decl. ¶ 16).

[11]     Plaintiff's "Medication Worksheet," which was prepared by Reynolds, provided that he would take Zyprexa daily, if clinically prescribed.  (Doc. #158-82 at Defendants 543).

The judge issued a one-year AOT order on August 31, 2017.  (See Doc. #158-82 at Defendants 523–524).  The order required plaintiff to take medication if the evaluating psychiatrist at the applicable treatment center determined that he should take it.  (Def. 56.1 Statement ¶ 52).

Although Reynolds concluded plaintiff met the criteria for an AOT, Reynolds attested he was not concerned about plaintiff's elevated affect or inappropriate smiling and laughing because "such symptoms, by themselves, would neither meet criteria for a mood episode nor indicate clinical instability."  (Reynolds Decl. ¶ 13).

I.      Baker

Baker, a social worker employed by OMH, worked with plaintiff to develop his discharge plan.  Baker met with plaintiff on August 3, August 16, and September 5, 2017, and was present when plaintiff was examined by Reynolds on August 25, 2017.  On August 11, Baker received plaintiff's March 16, 2017, discharge summary from Kirby Forensic Psychiatric Center, which stated the "accepting facility" should "encourage medication compliance as patient will decompensate if non-compliant."  (Doc. #158-87 at Defendants 636).

During the August 3 meeting, plaintiff noted his Zyprexa medication was "discontinued due to his refusal" and he told Baker he did not "need them."  (Doc. #145-1 at Defendants 315).  Plaintiff denied suicidal or homicidal ideation, as well as denied "experiencing psychiatric symptoms . . . includ[ing] depression, anxiety, mania or psychosis."  (Id.).  Plaintiff described his mood as "fine."  (Id.).  Baker observed plaintiff's thought processes "appear[ed] logical," plaintiff maintained appropriate eye contact, and plaintiff had no "hallucinations, delusions, obsessions, phobias, or over-valued ideas."  (Id. at Defendants 316).

During the August 16 meeting—which occurred while plaintiff was housed in SHU—Baker discussed the AOT and plaintiff's pre-release plan.  Baker's notes indicate she "encouraged Mr. Suarez to think about his mental health needs and talk with MD about medications," but that plaintiff stated he did "not feel any different on or off medication."  (Doc. #145-1 at Defendants 322).  Baker noted plaintiff continued to insist he did not need medication, denied "experiencing psychiatric symptoms," and described his mood as "ok."  (Id. at Defendants 322).  Similar to the August 3 meeting, Baker observed plaintiff maintained appropriate eye contact and lacked psychotic symptoms.  However, Baker noted plaintiff's insight and judgment were "poor."  (Id. at Defendants 323).

Baker was present during Reynolds's examination of plaintiff on August 25, 2017, and then met with plaintiff again on September 5, the day of plaintiff's release.  During this meeting, Baker provided plaintiff with a copy of his OMH discharge plan and other materials.  Plaintiff continued to deny he needed medication or that he was experiencing psychiatric symptoms.  (Doc. #145-1 at Defendants 335).  Baker notes plaintiff described his mood as "good," and she recorded similar observations about plaintiff maintaining appropriate eye contact and lacking psychotic symptoms.  (Id.).

Baker scheduled an appointment for plaintiff at a mental health clinic near his mother's home on Staten Island for September 7, 2017, two days after his release.

VI.   Plaintiff's Deposition Testimony

At his deposition, plaintiff testified that he began hearing voices about a month before his September 5, 2017, release.  (Doc. #137-1 ("Pl. Dep. Tr.") at 23).  He did not hear the voices consistently, or even every day.  According to plaintiff, the voices were telling him to protect himself because somebody close to him meant to harm him.  (Id. at 24).

Plaintiff did not advise any staff at Downstate that he was hearing voices.  (Pl. Dep. Tr. at 23–24, 63–64, 70).  He didn't tell the clinicians because he "thought the voices were going to go away and it wasn't going to matter."  (Id. at 24).

Plaintiff did not hear voices the first night he was released, nor did he have trouble sleeping.  (Pl. Dep. Tr. at 87).  In fact, plaintiff contends he felt fine the next morning, on September 6, 2017.  (Id. at 87–88).  He embarked on his day, going to see his parole officer and running errands with his mother.  However, he testified that they stopped at a Lowe's so plaintiff could copy his mother's keys and, as he sat in the car alone, the voices returned.  (Id. at 90–91). Plaintiff did not tell his mother he was hearing voices or experiencing other symptoms of mental illness.  When plaintiff and his mother arrived home, plaintiff "went to the kitchen[,] grabbed a knife and repeatedly stabbed [his] mother."  (Id. at 91).

Plaintiff believed, at the time of his deposition, that he took his medication only one time while at Downstate.  (Pl. Dep. Tr. at 60).  He did not remember meeting with any OMH clinicians until a month or two before he was discharged.  At that time, plaintiff testified, he met with a doctor and discussed medication.  According to plaintiff, "[w]e talked about me getting off medication and not taking it no more, he asked me why do I feel the need to not be on medication, I said I feel normal I feel fine.  I don't feel like I need medication anymore and he said okay.  We are going to try it then."  (Id. at 60).

According to plaintiff, the next time he met with a doctor at Downstate was when he created a release plan.  Plaintiff testified that during the meeting, they "talked about having an outpatient program," involving plaintiff "talking to a psychologist," and "they talked about me trying to keep myself on medication as best I can even though I refused medication, it would be helpful for me to take medication because I was mentally ill."  (Pl. Dep. Tr. at 78).

22

Plaintiff did not remember meeting with any other doctor or clinician at Downstate, including Kulick or DiNardo.  Plaintiff also did not remember his disciplinary hearing before Horan.  (Pl. Dep. Tr. at 69).

## DISCUSSION

I.   Standard of Review

The Court must grant a motion for summary judgment if the pleadings, discovery materials before the Court, and any affidavits show there is no genuine issue as to any material fact and it is clear the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

A fact is material when it "might affect the outcome of the suit under the governing law . . . .  Factual disputes that are irrelevant or unnecessary" are not material and thus cannot preclude summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).[12]

A dispute about a material fact is genuine if there is sufficient evidence upon which a reasonable jury could return a verdict for the non-moving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. at 248.  The Court "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried."  Wilson v. Nw. Mut. Ins. Co., 625 F.3d 54, 60 (2d Cir. 2010).  It is the moving party's burden to establish the absence of any genuine issue of material fact.  Zalaski v. Bridgeport Police Dep't, 613 F.3d 336, 340 (2d Cir. 2010).

If the non-moving party has failed to make a sufficient showing on an essential element of his case on which he has the burden of proof, then summary judgment is appropriate.  Celotex Corp. v. Catrett, 477 U.S. at 322–23.  If the non-moving party submits "merely colorable"

---

[12]    Unless otherwise indicated, case quotations omit all internal citations, quotations, footnotes, and alterations.

evidence, summary judgment may be granted.  Anderson v. Liberty Lobby, Inc., 477 U.S. at

249–50.  The non-moving party "must do more than simply show that there is some

metaphysical doubt as to the material facts, and may not rely on conclusory allegations or

unsubstantiated speculation."  Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011).  The

mere existence of a scintilla of evidence in support of the non-moving party's position is

likewise insufficient; there must be evidence on which the jury could reasonably find for him.

Dawson v. County of Westchester, 373 F.3d 265, 272 (2d Cir. 2004).

On summary judgment, the Court construes the facts, resolves all ambiguities, and draws

all permissible factual inferences in favor of the non-moving party.  Dallas Aerospace, Inc. v.

CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003).  If there is any evidence from which a

reasonable inference could be drawn in the non-movant's favor on the issue on which summary

judgment is sought, summary judgment is improper.  See Sec. Ins. Co. of Hartford v. Old

Dominion Freight Line, Inc., 391 F.3d 77, 82–83 (2d Cir. 2004).

In deciding a motion for summary judgment, the Court need consider only evidence that

would be admissible at trial.  Nora Bevs. v. Perrier Grp. of Am., Inc., 164 F.3d 736, 746 (2d Cir.

1998).  Accordingly, bald assertions, completely unsupported by admissible evidence, are not

sufficient to defeat summary judgment.  Carey v. Crescenzi, 923 F.2d 18, 21 (2d Cir. 1991).

II.     Eighth Amendment Claims

Plaintiff asserts two Eighth Amendment claims:  (i) a deliberate indifference claim

alleging defendants failed to provide plaintiff with appropriate individual mental health therapy

and sufficiently educate him about his need for medication, and (ii) a conditions of confinement

claim alleging defendants disregarded a serious risk to plaintiff's health or safety by housing him

in segregated disciplinary confinement notwithstanding his serious mental illness.

Defendants argue they are entitled to summary judgment on both Eighth Amendment claims because plaintiff cannot show defendants acted with the requisite subjective recklessness to plaintiff's health or safety.

The Court agrees.

A.    Legal Standard

Courts have construed the Eighth Amendment to protect prison inmates' rights to adequate medical care, Estelle v. Gamble, 429 U.S. 97, 103–04 (1976), as well as to protect against conditions of confinement that are less than humane.  Gaston v. Coughlin, 249 F.3d 156, 164 (2d Cir. 2001).  Although the two claims are distinct, they both require a plaintiff to establish that (i) he suffered a "sufficiently serious" harm, referred to as the objective component, and (ii) the officials in question acted with a "sufficiently culpable state of mind," referred to as the subjective or mens rea component.  Salahuddin v. Goord, 467 F.3d 263, 279–80 (2d Cir. 2006), abrogated on other grounds by Kravitz v. Purcell, 87 F.4th 111 (2d Cir. 2023).  Defendants only challenge plaintiff's ability to satisfy the subjective component of the analysis.[13]

To satisfy the subjective component, plaintiff must show defendants were aware of and consciously disregarded a substantial risk of serious harm to plaintiff.  Salahuddin v. Goord, 467 F.3d at 280.  A prison official's knowledge of a substantial risk of serious harm may be inferred from circumstantial evidence that "the risk was obvious."  Farmer v. Brennan, 511 U.S. 825, 842 (1994).  Conversely, "[p]rison officials charged with deliberate indifference might show, for

---

[13]    Although defendants do not concede that plaintiff has proven he suffered a sufficiently serious deprivation of medical care or inhumane conditions of confinement, they contend that, for purposes of this motion, the Court need not consider the objective component because plaintiff "cannot establish the subjective component for a deliberate indifference claim."  (Doc. #130 ("Def. Mem.") at 7).  Therefore, the Court does not consider whether plaintiff would otherwise be able to satisfy the objective component for his Eighth Amendment claims.

example, that they did not know of the underlying facts indicating a sufficiently substantial danger" or that "they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent." Id. at 844.  Moreover, even "prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." Id.  In other words, the Eighth Amendment charges prison officials "to ensure reasonable safety." Id.

B.   Analysis

According to plaintiff, defendants should have known plaintiff was and would continue to psychologically decompensate without additional individual therapy and medication education and when placed in disciplinary confinement, based on his history of mental illness, combined with his behavior while at Downstate.

However, here, the undisputed facts demonstrate it was not obvious to defendants that plaintiff was decompensating, and no defendant subjectively believed plaintiff faced a substantial risk of serious harm.  Therefore, a reasonable jury could not find for plaintiff on his Eighth Amendment claims.

1.   Annucci, Morton, and Lahey

As an initial matter, there is no genuine dispute that Annucci did not treat plaintiff and was not aware plaintiff was housed in segregated confinement.  Accordingly, Annucci was not personally involved in plaintiff's mental health care or the conditions of his confinement.  Therefore, plaintiff's Eighth Amendment claims against Annucci must be dismissed.  See Spavone v. N.Y. State Dep't of Corr. Servs., 719 F.3d 127, 135 (2d Cir. 2013) ("It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a

prerequisite to an award of damages under § 1983."); Smart v. Annucci, 2021 WL 260105, at *5 (S.D.N.Y. Jan. 26, 2021) ("Merely being in the chain of command is not enough" to prove an official, by his own conduct, constitutionally harmed a plaintiff).

As for Morton and Lahey, although these defendants may have interacted with plaintiff and exercised supervisory authority over the professionals who cared for him, this does not create a genuine issue of fact as to whether they knew plaintiff was actively decompensating or at risk of decompensating and disregarded the attendant risk of harm.

First, Morton (i) may have visited plaintiff during weekly visits to SHU, (ii) declined to renew plaintiff's deprivation order,[14] (iii) reviewed plaintiff's hearing packet for procedural hearing deficiencies, and (iv) petitioned for plaintiff to receive an AOT. Far from showing Morton disregarded risks to plaintiff's mental health, these actions demonstrate Morton was aware of plaintiff's risk of decompensation and acted to protect plaintiff from harm, including by declining to renew plaintiff's deprivation order at the first opportunity and seeking an AOT order that would mandate continued mental health treatment upon plaintiff's release. No reasonable juror would find that this was deliberate indifference.

Moreover, simply showing that Morton was aware of plaintiff's history with mental illness and had the authority to remove plaintiff from segregated confinement is not enough to prove he acted with subjective recklessness by failing to do so. Deliberate indifference requires proof that the defendant was "aware of facts from which the inference could be drawn that a substantial risk of serious harm" to plaintiff existed, and that Morton actually "dr[e]w the

---

[14]    Although plaintiff contends Morton "signed" plaintiff's deprivation order (Doc. #156 ("Pl. Opp.") at 5), the record reflects Morton was not the authorizing official on the order and that Morton actually recommended it be lifted. (See Doc. #158-50 at DOCCS Defendants -484, Doc. #167-5 at 190).

inference." <u>Farmer v. Brennan</u>, 511 U.S. at 837.  On this record, plaintiff has not raised a genuine dispute of fact as to whether Morton had subjective knowledge that plaintiff was at a substantial risk of decompensating in segregated confinement or in need of additional individual therapy and medication education.

Likewise with Lahey.  The evidence establishes Lahey (i) signed off on plaintiff's serious mental illness designation, (ii) might have interacted with plaintiff during weekly rounds in SHU, and (iii) would have reported to Morton regarding plaintiff at a weekly executive meeting. Even assuming Lahey did interact with plaintiff once or twice while plaintiff was in SHU, none of these actions, performed in Lahey's capacity as an OMH supervisor and not as a clinician treating plaintiff, create a genuine dispute about whether Lahey subjectively disregarded a risk that plaintiff would decompensate, particularly because plaintiff himself testified he never told any officials at Downstate that he was hearing voices.  (Pl. Dep. Tr. at 23–24, 63–64, 70); <u>cf.</u> <u>Barrett v. Livingston County</u>, 2019 WL 1083027, at *11 (W.D.N.Y. Mar. 7, 2019) (denying summary judgment on a deliberate indifference claim when the plaintiff told the nurse-defendant he "felt 'very suicidal' and 'wanted to die'" and no action was taken in response).

Accordingly, the Eighth Amendment claims against Annucci, Morton, and Lahey must be dismissed.

> 2.    <u>Horan</u>

Plaintiff claims Horan exhibited deliberate indifference by failing to divert plaintiff from SHU sooner than the conclusion of plaintiff's disciplinary hearing and by sentencing plaintiff to keeplock even though there was evidence such confinement was not suitable given plaintiff's mental status.

Horan was indisputably aware of plaintiff's serious mental illness designation.  Horan

also received SHU clinician DiNardo's confidential testimony that, in her opinion, plaintiff should not be placed in disciplinary housing because of his mental illness.  So too did he state on the record that he observed plaintiff to have signs of mental illness.  However, it is for these exact reasons that Horan stated at the disciplinary hearing, as well as subsequently in his deposition testimony and declaration, that he sentenced plaintiff to time served in SHU and suspended thirty days of plaintiff's keeplock sentence.  By his sentence, Horan subjectively intended, through the sentence he imposed, to "remove[] [plaintiff] from segregated confinement" as soon as possible after the hearing was over, which was just one day after receiving DiNardo's testimony.  (Horan Decl. ¶ 8).  Importantly, DiNardo testified to Horan that "[n]o matter the length of the sanction given, Mental Health will continue to monitor the inmate patient closely and make referrals for special programming when applicable." (Doc. #158-74 at 5).  Thus, Horan's behavior, when considered alongside facts of which he was indisputably aware, reveals a subjective intent to reduce plaintiff's risk of harm.  Even if these actions ultimately fell short, a reasonable jury could not find Horan acted with "wantonness."  Harris v. Miller, 818 F.3d 49, 63 (2d Cir. 2016).

Although plaintiff contends Horan should have diverted him from SHU even sooner, Horan testified he did not do so because he believed "if OMH felt that an inmate was inappropriately in any place in the facility, they could enact procedures to get that person the proper treatment in the setting that they think would be most appropriate for that person," (Doc. #167-11 at 112).  This testimony, which is without factual challenge in the record, proves Horan's subjective belief that plaintiff was not at a serious risk of harm in SHU during the disciplinary hearing because Horan believed that if plaintiff had been at risk, OMH staff would have addressed that harm.  For this reason, it is immaterial that Horan requested a brief extension

to commence plaintiff's hearing, because Horan subjectively believed OMH staff was monitoring plaintiff and would act if they felt plaintiff was inappropriately housed in SHU. Therefore, plaintiff fails to identify a triable dispute as to whether Horan knew of, and disregarded, a substantial risk of serious harm to plaintiff.

Accordingly, the Eighth Amendment claim against Horan must be dismissed.

### 3.   Kulick, DiNardo, Qayyum, Reynolds, and Baker

Defendants Kulick, DiNardo, Qayyum, Reynolds, and Baker (the "Treating Defendants") were the OMH doctors, clinicians and, in Baker's case, social worker who treated and/or evaluated plaintiff while he was at Downstate.  Plaintiff claims the Treating Defendants violated his Eighth Amendment rights by failing to provide him with individual therapy and medication education and by not removing him from segregated confinement as he decompensated. However, plaintiff fails to raise a genuine dispute regarding whether the Treating Defendants knew plaintiff was decompensating or was at risk of doing so.

Importantly, the distinct symptom of plaintiff's decompensation was unknown to the Treating Defendants because plaintiff did not tell anyone at Downstate he was hearing voices.

As to what the Treating Defendants could observe, the undisputed facts in the record prove that plaintiff consistently presented to and communicated with the Treating Defendants in a manner that did not give them reason to believe he was psychologically decompensating, notwithstanding their awareness of plaintiff's mental illness and history.

Except for DiNardo's interactions with plaintiff during daily rounds of SHU, each Treating Defendant took contemporaneous notes documenting their interactions with plaintiff. Of course, these notes reflect plaintiff exhibited some symptoms of his mental illness.  Most concerning, plaintiff was observed as inappropriately smiling and laughing during two meetings

with Reynolds (August 17 and 25) and one meeting with Qayyum (August 24).  But these symptoms cannot be considered in isolation.

For example, Dr. Qayyum also noted plaintiff denied any auditory or visual hallucinations and exhibited fair insight and judgment during their August 24 meeting. Similarly, Reynolds observed plaintiff as alert and properly oriented, and recorded that plaintiff denied experiencing hallucinations or homicidal ideations.  Thus, the record does not raise an inference that the Treating Defendants were subjectively aware plaintiff was or would psychologically decompensate.  See Robinson v. Taylor, 2019 WL 1429529, at *7 (N.D.N.Y. Mar. 29, 2019) (inmate plaintiff who attempted suicide while incarcerated failed to raise a triable question that defendant OMH psychiatrist acted with deliberate indifference to his mental health needs when the psychiatrist "observed Plaintiff to have no suicidal ideations, behaviors or plans; no acute warning signs or triggers; and no risk factors of suicide").

Plaintiff disagrees, pointing to notations by Reynolds, on August 17 and 25, as well as by Baker, on August 16, that plaintiff exhibited poor insight and judgment as evidence that plaintiff could not be trusted to evaluate his own mental health status and needs.  Even viewed in the light most favorable to plaintiff, these undisputed records do not create a triable issue as to whether these defendants consciously disregarded a serious risk that plaintiff was having a psychotic episode.  Conversely, Reynolds advocated for plaintiff to be issued the AOT order, which mandated post-release mental health treatment, including medication, and Baker "encouraged [plaintiff] to think about his mental health needs and talk with [a doctor] about medications." (Doc. #145-1 at Defendants 322).  Thus, far from acting indifferently, these defendants took affirmative steps to protect plaintiff from any harm his poor insight into his mental condition posed after his release.  Although plaintiff may believe Reynolds and Baker should have done

more, "such criticism points to failings in professional judgment, not deliberate indifference." Est. of King ex rel. King v. Annucci, __ F. Supp. 3d __, 2023 WL 6122868, at *12 (N.D.N.Y. Sept. 19, 2023).

As for Kulick and DiNardo, records documenting their visits with plaintiff indicate he was exhibiting few symptoms of mental illness. When meeting with Kulick, plaintiff was in a good mood and presented with fair insight and judgment, logical thought processes, and appropriate speech and behavior control. Although plaintiff made "sporadic" eye contact with Kulick immediately after he assaulted corrections officers, that lone symptom is insufficient to create a triable issue as to whether Kulick was deliberately indifferent to plaintiff's risk of decompensation. (Doc. #158-65 at Defendants 318).

When meeting with DiNardo, plaintiff was alert, friendly, and cooperative, and denied experiencing any hallucinations. That DiNardo testified plaintiff, due to his mental illness, should not be placed in disciplinary confinement does not create a triable issue as to her mental state in not removing him from SHU when, on the day after her testimony, plaintiff was again alert, friendly, and cooperative; oriented to time, person, and place; and denied experiencing hallucinations. Plaintiff does not argue he made complaints to DiNardo that she ignored, nor does he submit evidence that he was manifesting psychotic symptoms not reflected in his medical records. Accordingly, that DiNardo was not subjectively aware plaintiff was decompensating is wholly supported by the undisputed facts.

Therefore, even when considered against the background of plaintiff's prior psychiatric hospitalizations, no reasonable juror could find that any Treating Defendant disregarded a substantial risk that plaintiff was decompensating.

Accordingly, the Eighth Amendment claims against Kulick, DiNardo, Qayyum, Reynolds, and Baker must be dismissed.

Without a doubt, this case concerns a serious tragedy, one that perhaps could have been avoided if plaintiff were constantly supervised or provided top notch mental health care while incarcerated.  But the Constitution does not require exceptional medical care or comfortable conditions of confinement.  It requires reasonable medical care, humane conditions, and that the individuals charged with an inmate's care not ignore excessive risks to his safety.  Barnes v. Ross, 926 F. Supp. 2d 499, 506 (S.D.N.Y. 2013) ("[An inmate] is not entitled under the Eighth Amendment to the best treatment available; he is merely entitled to reasonable care.").  Here, plaintiff has failed to raise a material disputed fact about whether they did so.[15]

To the contrary, the undisputed facts portray an attentive team of mental health care professionals who made a judgment call, albeit one that in hindsight was flawed, that their mentally ill patient was lucid and functioning.  Even if they acted negligently by crediting plaintiff's assessment of his own psychological status, the post-release stabbing of his mother is so outrageous that it belies common sense to argue any Treating Defendant should have foreseen it.  Tempting as it is to point fingers with the benefit of hindsight, Eighth Amendment liability can arise only from the facts and circumstances of which defendants were aware at the time they treated plaintiff.

---

[15]     The Court is aware of the recent decision in plaintiff's mother's lawsuit against many of the same defendants as in this action denying those defendants' motion for summary judgment. See Idiakheua v. Morton, 2024 WL 417058 (E.D.N.Y. Feb. 5, 2024).  Notwithstanding that plaintiff's mother's case involves several of the same defendants and arises from some the same events as this action, that decision is not binding on this Court.  Moreover, Idiakheua involves a different plaintiff asserting claims arising under the Fourteenth Amendment, and a review of the decision suggests the record before the Idiakheua court was different from the record available to this Court to resolve the pending motion.

Accordingly, plaintiff's Eighth Amendment claims must be dismissed.

III.    SHU Exclusion Law Claim

Lahey, Kulick, and DiNardo argue plaintiff's claim under Section 137(6) of the New

York Correction Law must be dismissed because plaintiff's time in segregated confinement did

not have the potential to exceed thirty days.

The Court agrees.

A.    Legal Standard

When plaintiff was incarcerated at Downstate, the SHU Exclusion Law provided, except

in circumstances not applicable here:

> [T]he department, in consultation with mental health clinicians, shall divert or
> remove inmates with serious mental illness . . . from segregated confinement,
> where such confinement could potentially be for a period in excess of thirty days,
> to a residential mental health treatment unit.  Nothing in this paragraph shall be
> deemed to prevent the disciplinary process from proceeding in accordance with
> department rules and regulations for disciplinary hearings.

S. 6422, 2008 N.Y. Sess. Laws ch.1 § 4 (McKinney) (current version at N.Y. Correct. Law

§ 137(6)(d)(i)).[16]  If an incarcerated individual with a serious mental illness was not diverted or

removed from segregated confinement, the SHU Exclusion Law provided he or she should be

"offered a heightened level of care, involving a minimum of two hours each day, five days a

week, of out-of-cell therapeutic treatment and programming."  Id. (current version at N.Y.

Correct. Law § 137(6)(d)(iii)).

"Segregated confinement," when plaintiff was at Downstate, was defined as:

> [T]he confinement of an inmate in a special housing unit or in a separate keeplock
> housing unit.  Special housing units and separate keeplock units are housing units
> that consist of cells grouped so as to provide separation from the general population,

---

[16]    Section 137 has been amended since plaintiff's release.  See, e.g., S. A. 2277-A, 2021
Sess., 244th Leg. (N.Y. 2021).

and may be used to house inmates confined pursuant to the disciplinary procedures
described in regulations.

S. 6422, 2008 N.Y. Sess. Laws ch.1 § 2 (current version at N.Y. Correct. Law § 2(23).[17]

B.     Analysis

Plaintiff claims the SHU Exclusion Law required Lahey, Kulick, and DiNardo "to divert

Mr. Suarez from SHU upon [plaintiff's] receipt of a misbehavior report that exposed him to a

potential of more than 30 days in segregated confinement." (Pl. Opp. at 27). Plaintiff is

incorrect, because at no time did plaintiff face a potential of more than thirty days in segregated

confinement, as that term was defined.

DOCCS rules in effect in August 2017 required a disciplinary hearing to be commenced

within seven days and completed within fourteen days of the underlying incident. See Brooks v.

Prack, 77 F. Supp. 3d 301, 321 (W.D.N.Y. 2014) (quoting 7 N.Y.C.R.R. §§ 251-5.1(a), (b)).[18]

Although Horan received a one-day extension to commence plaintiff's hearing, he in fact

commenced the hearing within seven days, and did not request or receive an extension to the

mandate to complete the hearing in fourteen days. (Doc. #135-1 at Defendants 96–97).[19] And

Horan did, in fact, complete the hearing within fourteen days of the August 8 incident.

---

[17]     The New York Correction Law was subsequently amended, effective March 31, 2022, to
provide that "segregated confinement" means "the confinement of an inmate in any form of cell
confinement for more than seventeen hours a day other than in a facility-wide emergency or for
the purpose of providing medical or mental health treatment." N.Y. Correct. Law § 2(23).

[18]     After plaintiff's release, 7 N.Y.C.R.R. § 251-5.1 was amended to require a hearing to be
completed within five days of placement in segregated confinement, unless the incarcerated
individual requests a postponement for the purposes of seeking employee assistance and/or
representation.

[19]     The Court rejects plaintiff's argument that Horan would be permitted to "indefinitely
extend" the date by which he was required to commence a disciplinary hearing, such that
plaintiff faced the potential of more than thirty days in SHU as of the moment he was placed
there pending his hearing (Pl. Opp. at 27). This argument is without support in law or the record.

Accordingly, plaintiff's disciplinary process, and his temporary placement in SHU during it, had to conclude on August 22, 2017.  Of course, plaintiff could have been sentenced to additional time in SHU on August 22, but he was not.  Instead, plaintiff's sentence removed him from SHU immediately.  Therefore, at no point were defendants required to divert him or provide him with a heightened level of care under the statute.

This conclusion conforms with language in the SHU Exclusion Law which cautions the law should not "be deemed to prevent the disciplinary process from proceeding in accordance with department rules and regulations for disciplinary hearings."  S. 6422, 2008 N.Y. Sess. Laws ch.1 § 4 (current version at N.Y. Correct. Law § 137(6)(d)(i)).  It is undisputed that Downstate did not have a Special Program.  Plaintiff's position would have required defendants to relocate plaintiff to a correctional facility with a Special Program immediately upon his receipt of a Tier III misbehavior report.  Instead, confining plaintiff in SHU at Downstate while his hearing was pending, with the oversight of OMH staff and the option to move him to the FDU if necessary, allowed Downstate to timely proceed with the disciplinary process.  And ultimately, the sanction Horan levied had the effect of diverting plaintiff from segregated confinement the day it was issued, obviating the possibility that plaintiff would face more than thirty days in segregated confinement and any consequent need to transfer him or provide a heightened level of care.

Accordingly, plaintiff's claim pursuant to the SHU Exclusion Law against Lahey, Kulick, and DiNardo must be dismissed. [20]

---

[20]     Because defendants have demonstrated the absence of any material disputed facts and that they are entitled to judgment as a matter of law on each of plaintiff's claims, the Court does not address defendants' arguments respecting qualified immunity.

**CONCLUSION**

Defendants' motion for summary judgment is GRANTED.

The Clerk is instructed to terminate the motion (Doc. #129) and close this case.

Dated: February 26, 2024
        White Plains, NY

SO ORDERED:

_____
Vincent L. Briccetti
United States District Judge